STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RICHARD A. HOWERY, DEFENDANT-APPELLANT.

Argued January 9, 1979—Decided July 20, 1979.

Mr. *Barry J. Hockfield* argued the cause for defendant-appellant (*Mr. Stanley C. Van Ness,* Public Defender of New Jersey, attorney; *Mr. Maurice J. Molyneaux,* Assistant Deputy Public Defender, of counsel and on the brief).

Mr. *Dennis G. Wixted,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Thomas J. Schusted,* Camden County Prosecutor, attorney; *Mr. Wixted,* of counsel and on the brief).

Mr. *Mark Paul Cronin,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Edwin H. Stern,* Deputy Attorney General, of counsel; *Mr. Cronin,* of counsel and on the brief).

The opinion of the court was delivered by

CLIFFORD, J. We granted certification, 77 *N. J.* 497 (1978), to review the Appellate Division's affirmance, in an unreported opinion, of Richard Howery's conviction on three drug charges: possession of heroin with David Townsend and John Clark in violation of *N. J. S. A.* 24:21–20(a)(1); distribution of heroin with Townsend and Clark contrary to *N. J. S. A.* 24:21–19(a)(1); and conspiracy with Townsend and Clark to distribute heroin, a violation of *N. J. S. A.* 24:21–24. Townsend and Clark pleaded guilty and testified on behalf of the State. After the jury's guilty verdict,

Howery received consecutive terms of 10 to 12 years in New Jersey State Prison on the possession and distribution charges and a concurrent term of 3 to 5 years on the conspiracy conviction.

Before the Appellate Division defendant alleged error both as to his sentence and as to several trial rulings, including the admission of evidence obtained pursuant to a warrant search of his residence. Howery contended that the search warrant was invalid because the affidavit submitted in support thereof contained false statements material to a showing of probable cause. At the trial level hearing on his motion to suppress that evidence, defendant had sought to call witnesses for the purpose of establishing this falsity. The trial court disallowed the challenge, feeling bound by this Court's opinion in *State v. Petillo*, 61 *N. J.* 165 (1972), *cert.* den., 410 *U. S.* 945, 93 *S. Ct.* 1393, 35 *L. Ed.* 2d 611 (1973),[1] which held that a defendant may not challenge a facially sufficient search warrant on the ground that a supporting affidavit contains untruthful statements. Likewise in reliance on *Petillo* the Appellate Division rejected the attack on the warrant, recognizing that "on a motion to suppress evidence seized in execution of a search warrant, examination of a person whose affidavit supported the application for the warrant would normally be precluded"; and that "[t]he existence of probable cause for the warrant would be tested by what was presented to the issuing officer."

---

[1]Following the affirmance of his conviction the defendant in *State v. Petillo* successfully sought a writ of habeas corpus in Federal District court. *United States ex rel. Petillo v. New Jersey*, 400 *F. Supp.* 1152 (D. N. J. 1975). The Third Circuit vacated that judgment and remanded to the District Court for reconsideration in light of *Stone v. Powell*, 428 *U. S.* 465, 96 *S. Ct.* 3037, 49 *L. Ed.* 2d 1067 (1976). *United States ex rel. Petillo v. New Jersey*, 541 *F.* 2d 275 (3d Cir. 1976). The original writ was reinstated, 418 *F. Supp.* 686 (D. N. J. 1976), and on appeal the Third Circuit reversed. 562 *F.* 2d 903 (3d Cir. 1977).

## I

While Howery's appeal was pending in the Appellate Division, the United States Supreme Court granted certiorari in a case which squarely addressed the same issue decided by this Court in *Petillo, supra,* and raised here by Howery, namely, whether a criminal defendant must be allowed to challenge the validity of a search warrant on the basis of alleged false statements in a supporting affidavit. In *Franks v. Delaware,* 438 *U. S.* 154, 98 *S. Ct.* 2674, 57 *L. Ed.* 2d 667 (1978), decided only a few days after this Court granted Howery's petition for certification, the Supreme Court ruled as a matter of federal constitutional law that where a defendant makes a substantial preliminary showing of material misstatements in a search warrant affidavit, made knowingly or with reckless disregard for the truth, he must be afforded an opportunity to inquire further into the veracity of the affidavit. If at such inquiry the defendant proves such falsity by a preponderance of the evidence, the warrant is invalid and the evidence seized thereby must be suppressed. 438 *U. S.* at 155, 98 *S. Ct.* at 2676, 57 *L. Ed.* 2d at 672.

The Supreme Court's *Franks* decision resolved a conflict that had arisen in the state and lower federal courts over the application of state and federal constitutional principles to veracity challenges, both as to whether such challenges should ever be permitted, and, if so, under what circumstances they should be entertained. See 438 *U. S.* at 158, 98 *S. Ct.* at 2678, 57 *L. Ed.* 2d at 674 *nn.* 3 & 4. Among the decisions which had addressed the question was this Court's opinion in *State v. Petillo, supra,* wherein we held, with what was then the overwhelming majority of courts, that to permit such challenges was not required by the Federal Constitution. 61 *N. J.* at 175–76. Nor did our State Constitution compel a different result, *ibid.,* again aligning us with the majority of those courts which had looked to their respective constitutions. In *Petillo* this Court, in considering the competing considerations that determine the scope of suppression

remedy, looked to the nature of the constitutional guarantee against unreasonable searches and seizures, the interest of the public in prosecuting criminals, and the availability of other remedies in vindicating rights secured by the Fourth Amendment to the United States Constitution and Article I, ¶7 of the New Jersey Constitution. *Id.* at 173–79. In our view a sworn affidavit submitted to an impartial judge, establishing on its face legally sufficient probable cause, satisfied the demands of the Fourth Amendment and of Art. I, ¶7; and if the affidavit supporting a search warrant contained a false statement by a police officer, sufficient remedy for such perjury would lie in a criminal prosecution or a civil action against the untruthful officer. 61 *N. J.* at 174.

Insofar as our opinion in *Petillo* imposed an absolute ban on veracity challenges, unquestionably it has been overruled by *Franks.* However the *Franks* court, in holding that veracity challenges must be permitted, was mindful of the concerns which underlay our decision in Petillo. Having articulated those same competing considerations, the Supreme Court concluded that "because of them, the rule announced today has limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be afforded." 438 *U. S.* at 166–167, 98 *S. Ct.* at 2682–2683, 57 *L. Ed.* 2d at 679–80.

The limitations imposed by *Franks* are not insignificant. First, the defendant must make a "substantial preliminary showing" of falsity in the warrant. *Id.* at 681, 98 *S. Ct.* at 2684, 57 *L. Ed.* 2d at 681. In keeping with the purpose of the exclusionary rule as a deterrent to egregious police conduct, the defendant cannot rely on allegations of unintentional falsification in a warrant affidavit. He must allege "deliberate falsehood or reckless disregard for the truth," pointing out with specificity the portions of the warrant that are claimed to be untrue. These allegations should be supported by an offer of proof including reliable statements by witnesses, *id.* at 171. 98 *S. Ct.* at 2684, 57 *L. Ed.* 2d at

682, and they must be proved by a preponderance of the evidence. Finally, the misstatements claimed to be false must be material to the extent that when they are excised from the affidavit, that document no longer contains facts sufficient to establish probable cause. *Id.* at 171, 98 *S. Ct.* at 2684, 57 *L. Ed.* 2d at 682.

We note that subsequent to *Franks* the California Supreme Court has gone beyond the requirements of that decision by interpreting its own state constitution. That Court has held that a warrant is invalid when a supporting affidavit is found to contain *any* deliberate untruth, whether the misstatement is material or not, because in its view the discovery of a deliberate falsity, even if itself unimportant, undermines the credibility of the entire affidavit. *People v. Cook,* 22 *Cal.* 3d 67, 148 *Cal. Rptr.* 605, 583 *P.* 2d 130 (1978). In view of the reasoning in our opinion in *State v. Petillo,* based in part on an interpretation of this State's constitution, we decline to follow the California approach. Hence we hold that New Jersey courts, in entertaining veracity challenges, need go no further than is required as a matter of Federal Constitutional law by *Franks v. Delaware, supra.*

## II

Although *Franks v. Delaware* was decided subsequent to the suppression hearing and trial in this case, Howery urges that the rule announced in *Franks* should be applied retroactively. It is his contention that if the *Franks* rule is applied to the facts as adduced at his trial, he will be entitled to suppression of the evidence seized in the search of his home and thus to a new trial.

In *State v. Nash,* 64 *N. J.* 464, 469–70 (1974), this Court identified the four approaches that have been developed with respect to the applicability of a new rule of law: strict prospectivity, general retroactivity, and two forms of limited retroactivity. We there pointed out that in determining

which approach should be adopted in a given case, the competing considerations "are weighed by examining (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *Id.* at 471.

As to the first of the factors to be considered we find persuasive the observation made by the United States Supreme Court in *United States v. Peltier,* 422 *U. S.* 531, 535, 95 *S. Ct.* 2313, 2316, 45 *L. Ed.* 2d 374, 380 (1975), that "in every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule * * * [it] has concluded that any such new constitutional principle would be accorded only prospective application." This result has obtained, the Court explained, because the deterrent purposes of the exclusionary rule are not served by retroactive application. *Id.* at 538–39, 95 *S. Ct.* at 2317–2318, 45 *L. Ed.* 2d at 382. More importantly, the reliability and relevancy of the evidence sought to be suppressed in this case is not questioned. The *Franks* rule, being a new variant of the exclusionary rule device, is not one which concerns either the reliability of the verdict or the integrity of the fact-finding process at a criminal trial. *Id.*

The dissenting opinion would have us apply *Franks* retroactively in order to "uphold 'the imperative of judicial integrity.' " *Ante* at 578. While it is true that a secondary purpose of the exclusionary rule is to vindicate the integrity of the judicial process, it is also true that the United States Supreme Court has eschewed any substantial reliance on this rationale in determining the scope of application of that device.

While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence.
[*Stone v. Powell,* 428 *U. S.* 465, 485, 96
*S. Ct.* 3037, 3048, 49 *L. Ed.* 2d 1067,
1083 (1976).]

*Franks v. Delaware* is illustrative of the above-stated principle. The Supreme Court did not rely on the "judicial integrity" rationale in holding that veracity challenges must be permitted, *Franks v. Delaware, supra,* 438 *U. S.* at 166–167, 98 *S. Ct.* at 2682–2683, 57 *L. Ed.* 2d at 679–80; rather, the thrust of the Court's reasoning was that the prospect of a subsequent challenge to the veracity of statements made in a search warrant is necessary to "discourage lawless or reckless misconduct." *Id.* 438 *U. S.* at 167, 98 *S. Ct.* at 2683, 57 *L. Ed.* 2d at 680. It would be inconsistent with the Supreme Court's reasoning in *Franks* to justify a retroactive application of the *Franks* rule on a rationale that was not relied on in fashioning that rule in the first instance.

With respect to the second of the factors enumerated in *Nash,* there can be no doubt of the reliance in this jurisdiction on the now-overruled *Petillo* decision. The trial court here repeatedly referred to *Petillo* in refusing to allow the defendant to "try the search warrant" at his trial. Unquestionably this ruling was correct under the law applicable at the time the suppression hearing was held; hence, even if it be assumed that the warrant contains perjurious statements, the conviction of the defendant was obtained in good faith reliance on "then-prevailing constitutional norms." *Peltier, supra,* 422 *U. S.* at 536, 95 *S. Ct.* at 2316, 45 *L. Ed.* 2d at 380; *Linkletter v. Walker,* 381 *U. S.* 618, 636–40, 85 *S. Ct.* 1731, 1741–1743, 14 *L. Ed.* 2d 601, 612–14 (1965). And as indicated above, the Appellate Division as well relied on *Petillo* in upholding the conviction in this case. ·

It matters not, for purposes of determining the question of retroactivity, that the police officers may have acted in bad faith by "relying" on the *Petillo* rule in perjuring themselves in order to obtain a warrant. Refusals to apply exclusionary rule decision retroactively have *not* depended on whether or not the police may have deliberately broken the law in seizing evidence. In *Linkletter v. Walker, supra,* the Supreme Court recognized that prior to *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed.* 2d 1081 state law en-

forcement officials were relying on the absence of a federally-imposed exclusionary rule as "a license to violate" the prohibition against unreasonable searches and seizures. 381 *U. S.* at 635, 85 *S. Ct.* at 1740, 14 *L. Ed.* 2d at 612. Such deliberate conduct was no less offensive or illegal than any perjury that may have taken place in this case, yet the 'Court declined to afford the *Mapp* exclusionary rule retroactive application. A similar result obtained in *Fuller v. Alaska,* 393 *U. S.* 80, 89 *S. Ct.* 61, 21 *L. Ed.* 2d 212 (1968), where the Court declined to make retroactive its decision in *Lee v. Florida,* 392 *U. S.* 378, 88 *S. Ct.* 2096, 20 *L. Ed.* 2d 1166 (1968) (evidence seized by state officers in violation of federal statute inadmissible in state criminal trials). Our approach to this aspect of the retroactivity problem is consistent with that of the Supreme Court which reasoned, in *Peltier,* that if *bad faith* reliance on a rule of law does not offend the imperative of judicial integrity, "[i]t would seem to follow *a fortiori* from the *Linkletter* and *Fuller* holdings that the 'imperative of judicial integrity' is *also* not offended if law enforcement officials reasonably believed in good faith that their *conduct* was in accordance with the law * * *." 422 *U. S.* at 537–38, 95 *S. Ct.* at 2317–2318, 45 *L. Ed.* 2d at 381 (emphasis supplied and in original).

▮ Finally, the effect of retroactive application of *Franks* on the administration of justice would be significant. It would require courts to delve into the allegations of what would doubtless be a considerable number of defendants, to the effect that police officers had lied in affidavits long stale. Having considered the relevant factors, it is our view that *Franks* should be applied prospectively only — that is, to search warrants issued after the *Franks* decision, and thus not to this case. Hence, the attack on the search warrant must fail.

## III

Despite the conclusion stated above, we go further to demonstrate that our examination of the record discloses the

inaccuracy of defendant's contention that if we were to apply *Franks* to his case, a reversal and new trial would be mandated.

The sequence of events leading to defendant's conviction began with the arrest of one Neil Agostini by Detective George Morris of the Pennsauken Police Department on July 31, 1973. Agostini agreed to cooperate with the police and make a controlled purchase of narcotics. Later that same day Detective Morris listened as Agostini telephoned David Townsend to arrange a purchase of two "bundles," or 50 bags, of heroin. That evening Townsend arrived at Agostini's house. Agostini gave Townsend $240 that had been provided by the police officers, who had earlier recorded some of the serial numbers of this currency, and Townsend departed. He returned at 2:00 o'clock the next morning driving defendant Howery's Volkswagen, whereupon he was arrested by Detective Morris. In Townsend's possession were 55 glassine envelopes of heroin as well as a twenty-dollar bill bearing one of the previously-recorded serial numbers.

Based on information supplied by Townsend the police made a warrant search of the residence of John Clark later the same morning and seized 881 bags of heroin and a note. That note, introduced into evidence at Howery's trial, read: "It's OK, give Dave (2). Rich." The prosecutor argued at trial that this note was from Richard Howery authorizing John Clark to give David Townsend two "bundles" of heroin — the same heroin that was later bought by Neil Agostini under police supervision.

Following his arrest Clark gave Detective Morris information regarding his drug dealings with Richard Howery. Armed with the information supplied by Clark and earlier by David Townsend, Detective Morris executed an affidavit detailing the circumstances of the arrests of Agostini, Townsend and Clark, and the admission by Clark that defendant Howery was his drug supplier. Based on the affidavit a warrant for the search of Howery's residence issued.

At the commencement of this search, the officers read Howery his *Miranda* warnings. The search yielded, among other things, four one-dollar bills, which had been among the marked and recorded currency given to Townsend by Agostini for the drug purchase, and a blue note pad. Both were later admitted into evidence at Howery's trial. Officers present at the search also testified at Howery's trial that when Howery learned of the marked bills, he stated: "You'd expect them to mark the twenty dollar bills but the m . . . . . f . . . . .s marked the ones."

Howery alleges two instances of misrepresentation in the search warrant affidavit executed by Detective Morris. He points to two discrepancies between the note seized at the residence of John Clark and the description of that note in paragraph 16 of the affidavit. The note in fact read: "It's OK, give Dave (2). Rich." In the affidavit Detective Morris recited in paragraph 16 that "found in possession of John Clark was a note signed 'Richie' telling Clark to give Dave two bundles." Thus, the affidavit said that the note was signed "Richie" instead of "Rich," and the word "bundles" was inserted.

As to the use of the name "Richie" instead of "Rich," it would be absurd to contend that such a minor error is of the kind that might vitiate a finding of probable cause in the warrant affidavit, and under the circumstances before us we attach no weight whatsoever to it. The insertion of the word "bundles" is more troublesome, however. We have seen enough of these cases to have learned that that word is used in the drug trade to specify a quantity of heroin. Its use in the affidavit obviously is an interpretation by the affiant of the literal words of the note. Howery argues that the note standing alone is innocuous and that the calculated addition of the word "bundles" attaches a sinister meaning to an otherwise innocent communication. But this one element of the affidavit cannot be taken out of context; it must be read in connection with the events described in the preceding paragraphs of the affidavit, all of which revolve around the

purchase of two "bundles" of heroin. Evaluating the entire affidavit in a commonsense and realistic fashion, *State v. Kasabucki,* 52 *N. J.* 110 (1968), it is a fair interpretation of the note's terms to conclude that the reference "(2)" was to "two bundles" of heroin. Moreover, the word "bundles" cannot be said to be "material" as defined in *Franks v. Delaware,* for even if the word "bundles" is stricken from paragraph 16 of the affidavit, that document as a whole would still satisfy the probable cause standard.

The second alleged warrant error pointed to by Howery relates to paragraph 19 of Detective Morris's affidavit, which reads in its entirety: "That John 'Clark told me on August 1, 1973, that, Richard Howery customarily keeps a quantity of Heroin at his residence." This statement is unquestionably material to the finding of probable cause to search Howery's residence, for although the affidavit details at some length the drug transactions whics led police to conclude that Howery was a drug dealer, the only mention of heroin being kept at Howery's residence is in this statement. See *Zurcher v. Stanford Daily,* 436 *U. S.* 547, 556, 98 *S. Ct.* 1970, 1976, 56 *L. Ed.* 2d 525, 535 (1978).

The veracity of the statement in paragraph 19 came into question during the direct testimony of John Clark, who, as noted previously, testified for the prosecution at Howery's trial. He denied telling Detective Morris at the time he was arrested that Richard Howery kept heroin at his house because he knew that Howery never kept drugs at his own house. On redirect examination Clark testified that he may have told Detective Morris that the quantity of heroin utilized in the drug distribution ring was kept at the residence of *Jimmy* Howery, the brother of defendant, for that was where Clark understood the drugs were kept. The trial judge became "disturbed" by the inconsistency between Clark's testimony and the statement attributed to him by Detective Morris in paragraph 19, and in order to clarify the situation he conducted a voir dire of both Morris and Clark. Morris reiterated that he understood Clark to have meant

that the heroin was kept at the house of defendant *Richard* Howery, not that of his brother, Jimmy.

 It is apparent from the foregoing that the misrepresentation, if any, concerning the presence of heroin at the defendant's house resulted from a misunderstanding between Clark and Detective Morris as to which Howery Clark was referring to rather than from the type of bad-faith, perjurious misconduct which would necessitate excision of the challenged paragraph from the affidavit under *Franks v. Delaware*. Defendant's claim that the application of *Franks* to his case should result in a new trial is therefore unfounded.

## IV

We have carefully considered defendant's remaining contentions and find them to be without merit.

Affirmed.

PASHMAN, J., dissenting. I respectfully dissent. On June 26, 1978 — the date upon which the Supreme Court decided *Franks v. Delaware*, 438 *U. S.* 154, 98 *S. Ct.* 2674, 57 *L. Ed.* 2d 667 (1978) — defendant had not yet exhausted all avenues of direct judicial review to which he was entitled by Rule of Court. In fact, five days prior to *Franks* we granted the petition for certification filed on his behalf. The strictures of *Franks* should therefore be applicable to the facts of this case, notwithstanding that both the issuance of the challenged warrant and the trial judge's ruling preceded the Supreme Court's decision. The majority's conclusion to the contrary is predicated upon a misunderstanding of caselaw dealing with the problem of retroactivity in Fourth Amendment contexts, and places a judicial imprimatur upon the conduct of police officers who in bad faith have perjured themselves before magistrates charged with the solemn duty of issuing search warrants.

I

As the majority emphasizes, the *Franks* decision squarely overruled this Court's holding in *State v. Petillo,* 61 *N. J.* 165 (1972), *cert.* den., 410 *U. S.* 945, 93 *S. Ct.* 1393, 35 *L. Ed.* 2d 611 (1973). As such, *Franks* clearly changed the law regarding the permissibility of a criminal defendant's challenge to a facially sufficient search warrant. The question to be decided is whether, and to what extent, this "new" rule should be given retrospective application.

Supreme Court holdings dealing with the retroactive effect to be accorded decisions expanding the rights of criminal defendants have not followed a uniform path. In certain contexts, the Court has ruled that "new" constitutional doctrines limiting the actions of state agents are retroactive only in the sense that they govern the rights of the parties to the overruling case itself, but not those of other defendants who have been victimized prior to the announcement of the new rule. *See, e. g., United States v. Peltier,* 422 *U. S.* 531, 95 *S. Ct.* 2313, 45 *L. Ed.* 2d 374 (1975) (legality of border searches); *Stovall v. Denno,* 388 *U. S.* 293, 87 *S. Ct.* 1967, 18 *L. Ed.* 2d 1199 (1967) (right to counsel at pretrial lineup). In other situations, a new constitutional rule has been held applicable to all cases pending direct judicial review at the time the new rule was handed down. *See, e. g., Linkletter v. Walker,* 381 *U. S.* 618, 85 *S. Ct.* 1731, 14 *L. Ed.* 2d 601 (1965) (application of "exclusionary rule" to the states); *State v. Nash,* 64 *N. J.* 464 (1974) (prohibition against imposition of more severe sentence following appeal). Finally, certain "new" rules have been held to apply even to those cases in which final judgment has been entered and all avenues of direct judicial review have been exhausted. *See, e. g., Pickelsimer v. Wainwright,* 375 *U. S.* 2, 84 *S. Ct.* 80, 11 *L. Ed.* 2d 41 (1963) (right to counsel at trial); *Eskridge v. Washington State Board,* 357 *U. S.* 214, 78 *S. Ct.* 1061, 2 *L. Ed.* 2d 1269 (1958) (free transcript to indigents appealing criminal convictions).

The federal Constitution itself neither prohibits nor requires that expansions of the rights accorded criminal defendants be given retrospective application. *See, e. g., Williams v. United States,* 401 *U. S.* 646, 651, 91 *S. Ct.* 1148, 1151, 28 *L. Ed.* 2d 388, 394 (1971); *Linkletter, supra,* 381 *U. S.* at 629, 85 *S. Ct.* at 1737, 14 *L. Ed.* 2d at 608. Rather, in each case a court must weigh and balance the competing considerations militating in favor of or against any particular form of retroactivity. The major criteria which must guide the resolution of such a question are:

(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

[*Stovall, supra,* 388 *U. S.* at 297, 87 S. Ct. at 1970, 18 *L. Ed.* 2d at 1203]

*See, e. g., Williams, supra,* 401 *U. S.* at 652, 91 *S. Ct.* at 1152, 28 *L. Ed.* 2d at 394; *Johnson v. New Jersey,* 384 *U. S.* 719, 728, 86 *S. Ct.* 1772, 1778, 16 *L. Ed.* 2d 882, 889 (1966); *Linkletter, supra,* 381 *U. S.* at 636, 85 *S. Ct.* at 1741, 14 *L. Ed.* 2d at 612; *State v. Nash, supra,* 64 *N. J.* at 471. In my view, a consideration of each of these factors leads to the conclusion that the *Franks* doctrine should be applicable to the facts of this, and every other, case in which all avenues of direct judicial review were not exhausted prior to the date on which *Franks* was decided.

## A

### *The Purpose of the Franks Rule*

The majority states that the sole purpose of the *Franks* doctrine, and indeed the exclusionary rule in general, is that of deterring illegal police conduct. Since any perjury that may have been committed is already a *fait accompli,* the argument goes, this goal will not be served by suppressing the evidence seized pursuant to the Howery warrant.

The majority's argument in this regard is faulty in at least two respects. First, it is not the case that deterrence is the sole purpose of the exclusionary rule. Time and again, the Supreme Court has emphasized that this rule is also designed to uphold "the imperative of judicial integrity." *United States v. Peltier, supra,* 422 *U. S.* at 536–538, 95 *S. Ct.* at 2316–2317, 45 *L. Ed.* 2d at 380–382; *see, e. g., Mapp v. Ohio,* 367 *U. S.* 643, 659, 81 *S. Ct.* 1684, 1693, 6 *L. Ed.* 2d 1081, 1092 (1961); *Elkins v. United States,* 364 *U. S.* 206, 222, 80 *S. Ct.* 1437, 1446, 4 *L. Ed.* 2d 1669, 1680 (1960). *See generally,* Note, "Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments," 90 *Harv. L. Rev.* 945 (1977). Illegally obtained evidence is not suppressed merely to provide state agents with a disincentive to violating individuals' Fourth Amendment rights. Its admission at trial is also prohibited in order that the integrity of the judicial process not be tainted through use of the fruits of crime in order to secure a conviction.[1] In the now famous words of Justice Brandeis:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the govern-

---

[1]The majority asserts that "the United States Supreme Court has eschewed any substantial reliance on the [judicial integrity] rationale in determining the scope of the application of" the exclusionary rule. *Ante* at 569. In support of this proposition, the majority cites *Stone v. Powell,* 428 *U. S.* 465, 96 *S. Ct.* 3037, 49 *L. Ed.* 2d 1067 (1976) — a case which, unlike the present matter, was not concerned with the question of retroactivity. In *United States v. Peltier, supra* — a case which is the Supreme Court's most recent retroactivity decision — the majority took great pains to emphasize that the police conduct there involved did *not* violate the "imperative of judicial integrity." *See* 422 *U. S.* at 536–538, 95 *S. Ct.* at 2316–2317, 45 *L. Ed.* 2d at 380–382. This justification of the policemen's actions would have been wholly unnecessary had the Justices been of the view that the "judicial integrity" rationale of the exclusionary rule was no longer viable.

ment will be imperiled if it fails to observe the law scrupulously. * * * If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. * * * [T]o declare that the government may commit crimes in order to secure the conviction of a private criminal * * * would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

> [*Olmstead v. United States*, 277 *U. S.* 438, 485, 48 *S. Ct.* 564, 575, 72 *L. Ed.* 944, 959–960 (1928) (Brandeis, J., joined by Holmes, J., dissenting)]

Instead of discussing this "judicial integrity" purpose of the exclusionary rule, the majority takes refuge in Justice Rehnquist's observation that decisions expanding individuals' Fourth Amendment rights have never been accorded even limited retroactive effect. *See United States v. Peltier, supra,* 422 *U. S.* at 535, 95 *S. Ct.* at 2316, 45 *L. Ed.* 2d at 380. The majority, however, fails to recognize that one of the principal rationales underlying these "prospective" Fourth Amendment decisions is not present in a *Franks*-type situation.

Almost every case in which a new rule has been applied purely prospectively has involved a situation in which policemen reasonably believed in good faith at the time of a search or seizure that their conduct was in accordance with the law. Admission of the fruits of those searches at trial has therefore been deemed not to violate the "imperative of judicial integrity," even though decisions subsequent to the searches have held that the conduct engaged in by the law enforcement officers was not permitted by the Constitution. *See, e. g., United States v. Peltier, supra; Williams, supra; Stovall, supra.*[2]

---

[2]At first glance, it might appear that the Supreme Court's decision in *Linkletter, supra,* departs from this principle inasmuch as the police there involved knew at the time of the search that their conduct was illegal. Upon closer analysis, however, it can be seen that *Linkletter* is wholly consistent with the "judicial integrity" rationale discussed above. Unlike *Peltier* and *Williams*, the issue confronted by the Court in *Linkletter* was whether a new Fourth Amendment

In the present case, one would be hard put to conclude that Detective Morris reasonably believed in good faith that knowingly swearing to the truth of false statements was in accordance with the law. *State v. Petillo* did not legitimize perjury. Nor did *Franks* resurrect it as a crime. False swearing was illegal when the Howery affidavit was executed, it was illegal when Howery was brought to trial, and it remains illegal today. Thus, irrespective of the controlling weight of Petillo when the search warrant was obtained, Detective Morris would not have been acting in accordance with the law if he swore falsely before the magistrate.

The majority's "deterrence" argument is also flawed in that it assumes that the deterrence rationale itself will not be served by retroactively applying the *Franks* doctrine. It is true, as the majority emphasizes, that any perjury[3] that may have been committed by Detective Morris is already a *fait accompli.* This result, however, will obtain in any situation in which illegally seized evidence is sought to be introduced at trial — even if the policeman involved has deliberately defied a controlling Fourth Amendment decision in order to obtain that evidence.

---

doctrine should be applied to cases in which all avenues of direct judicial review had been exhausted prior to the announcement of the new rule — not whether a new rule should merely be applied to cases pending direct review at the time the new rule was pronounced. Despite the bad faith of the police, the Court determined that the administration of justice would be seriously eroded if the new ruling were applied to the "thousands of cases that were finally decided" before the new rule was announced. *Linkletter, supra,* 381 *U. S.* at 636, 85 *S. Ct.* at 1741, 14 *L. Ed.* 2d at 612. In this case, as in *Peltier* and *Williams,* defendant merely seeks to have a new ruling applied to those few cases pending judicial review at the time the new ruling was announced.

3By the terms "perjury" and "false swearing," I mean to refer to the type of conduct condemned in *Franks* — that is, a false statement made knowingly, intentionally or with reckless disregard for the truth. *See* 438 *U. S.* at 171, 98 *S. Ct.* at 2684, 57 *L. Ed.* 2d at 682.

What the majority fails to perceive is that the "deterrence" which the exclusionary rule is designed to achieve is not simply the deterrence of the particular past act challenged at a suppression hearing. Rather, the rule is designed to deter all policemen from in the future acting contrary to the law. In certain Fourth Amendment contexts, this goal will not be served by according retroactive effect to a "new" ruling. This is so because at the time the police conduct occurred, the policemen reasonably believed in good faith that such conduct was wholly legal. *See, e g., United States v. Peltier, supra,* 422 *U. S.* at 536–538, 95 *S. Ct.* at 2316–2317, 45 *L. Ed.* 2d at 380–382; *Williams, supra; Stovall, supra,* 388 *U. S.* at 299–300, 87 *S. Ct.* at 1971, 18 *L. Ed.* 2d at 1205. In the present case, however, false swearing was illegal when Detective Morris executed the Howery affidavit. Thus, if Morris lied before the magistrate, suppression of the evidence seized as a direct result of his perjury will serve the goal of deterring all policemen from using illegal means to obtain evidence.

The conclusion is therefore inescapable that both the "judicial integrity" and "deterrence" goals sought to be achieved by the exclusionary rule will in fact be furthered by applying *Franks* to the facts of this case. Moreover, both goals will be disserved if *Franks* is not so applied in that policemen who have in bad faith perjured themselves before magistrates will be rewarded for their efforts.

B

*The Extent of Reliance by Law Enforcement Authorities Upon Petillo*

The majority states that "there can be no doubt of the reliance in this jurisdiction on the now-overruled *Petillo* decision." *Ante* at 570. In support of this proposition, it points out that both the trial court and the Appellate Division relied in good faith upon that case when denying Howery the right to challenge the facially sufficient search warrant.

Unfortunately, it is not the reliance of the *lower courts* upon an overruled decision which is of central relevance in a retroactivity determination. Were such the case, then *no* overruling decision would ever be applicable even to the parties involved in the overruling case itself. Rather, what is of major importance is the extent of reliance by *law enforcement authorities* — *i. e.,* the police, not the judges — upon the overruled decision. The reasoning underlying this inquiry is that state agents should not be penalized for complying in good faith with "prevailing constitutional norms" at the time a search was conducted. *See, e. g., United States v. Peltier,* 422 *U. S.* at 536–538, 95 *S. Ct.* at 2316–2317, 45 *L. Ed.* 2d at 380–382; *Stovall, supra,* 388 *U. S.* at 299–300, 87 *S. Ct.* at 1971, 18 *L. Ed.* 2d at 1205; *Johnson, supra.*

As discussed in Part A *supra,* however, any perjury that may have been committed by Detective Morris cannot be said to have derived to any degree from a good faith reliance upon *Petillo.* That case merely held that a criminal defendant could not attack the validity of a facially sufficient search warrant. It did not legitimize false swearing.

## C

### *Effect On the Administration of Justice*

The majority states that retroactive application of *Franks* would be detrimental to the administration of justice in that "[i]t would require courts to delve into the allegations of what would doubtless be a considerable number of defendants, to the effect that police officers had lied in affidavits long stale." *Ante* at 571. To the extent that the majority's remarks pertain to cases in which final judgment had been entered and all avenues of direct judicial review were exhausted prior to the *Franks* decision, I agree. Any other conclusion would likely inundate our lower courts with a deluge of petitions supported by such "stale" evidence.

This consideration, however, should not stand in the way of applying the *Franks* doctrine to those cases which were still pending direct review at the time *Franks* was decided. Such cases will doubtless *not* be considerable in number. Moreover, allegations of perjury will not be predicated upon stale evidence. Finally, new trials will not necessarily be mandated in even these few instances. Rather, only if the trial judge, after conducting a *Franks* inquiry, determines that the evidence must be suppressed will the conviction of any defendant need to be overturned.[4]

According this degree of retroactive effect to *Franks* is especially compelling in view of the fact that it will support both the "judicial integrity" and "deterrence" purposes of the exclusionary rule. Further, it will not — as will the majority's holding — place our imprimatur upon the conduct of police officers who have disobeyed the law by swearing falsely before magistrates.

## II

Despite its ruling that *Franks* is not here applicable, the majority examines the record below in order to establish that defendant's convictions would stand even were he permitted to attack the search warrant in question. A careful reading of that record, however, demonstrates that the majority's analysis is deficient in many material respects.

It is undisputed that the note seized by Detective Morris at John Clark's residence read "It's OK, give Dave (2). Rich." In his affidavit, however, Morris swore that "found

---

[4] It should also be noted that in many cases a full *Franks* hearing will not be necessary. Such a hearing is required only if the defendant can make a substantial preliminary showing of perjury. He must allege "deliberate falsehood or reckless disregard for the truth," and those allegations must be supported by an offer of proof. Finally, the misstatements claimed to be false must be material to the extent that when they are excised from the affidavit, that document no longer contains facts sufficient for a finding of probable cause.

in the possession of John Clark, was a note signed 'Richie' telling Clark to give Dave two *bundles"* (emphasis supplied). The majority admits this is "troublesome" but attaches no significance whatsoever to the fact that the word "bundles" did not appear in the note. In its view, a consideration of the note in light of all attendant circumstances would in any event have led the magistrate to conclude that "(2)" referred to two bundles of heroin.

The main "attendant circumstance" upon which the majority bases its conclusion — *i. e.,* that inculpatory evidence was in fact located at Howery's residence — was not, however, known until after the warrant was secured and the search conducted.[5] Aside from those portions of the Morris affidavit which were allegedly sworn to falsely, the only "circumstances" linking Howery to heroin were statements in the affidavit that (1) Dave Townsend had sold heroin to Noel Agostini on August 1, 1973, and had driven to the point of sale in a car registered in Howery's name; and (2) Howery and Townsend "have been seen together at known narcotics spots." In my view, these circumstances alone were hardly sufficient to convince a magistrate that "(2)" referred to two bundles of heroin. It is noteworthy that at Howery's trial, Townsend testified that the "(2)" denoted two cases of liquor.

This error on the majority's part is, however, small in comparison to the deficiencies extant in its analysis of Howery's second allegation of false swearing. In his affidavit, Detective Morris swore that "John Clark told me on August 1, 1973, that, Richard Howery customarily keeps a quantity of Heroin at his residence." The majority correctly holds that this statement was material to a finding of probable cause. Nevertheless, by means of arbitrary *ad hoc* "factfinding," it concludes that any misrepresentation present in the affidavit

---

[5] It is well established that "[a] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." *United States v. DiRe,* 332 U. S. 581, 595, 68 S. Ct. 222, 228, 92 L. Ed. 210, 220 (1948).

was not the product of "bad-faith, perjurious conduct," but instead derived from an innocent "misunderstanding" between Clark and Morris. *Ante* at 574–575.

The manner in which the majority found these "facts" is somewhat puzzling. At Howery's trial, Clark testified that he did not tell Morris that Howery kept narcotics in his home. Morris testified that Clark had indeed given him such information. From this testimony, the majority concludes that the challenged portion of Morris' affidavit was the product of an innocent misunderstanding on Morris' part. This conclusion is reached despite the fact that the majority did not observe Morris' demeanor at the time he uttered the above testimony, and hence is in no position to judge his credibility. *See State v. Singletary,* 80 *N. J.* 55, 62–63 (1979). The majority appears to find it inconceivable that Detective Morris may have sworn falsely on the stand — a possibility which, of course, would require that this case be remanded to the trial judge for a *Franks* hearing.

More importantly, while engaging in its *ad hoc* "fact" finding, the majority completely ignores the fact that at trial Howery requested and was denied permission to call additional witnesses in order to substantiate his allegations of perjury. If *Franks* is to have any significance, at the very least a defendant must be allowed to introduce evidence in support of his cause before his petition is ruled upon. The majority's conclusion to the contrary not only does disservice to the Fourth Amendment, it also "makes a mockery of 'due process'" of law. *In re Farber,* 78 *N. J.* 259, 285 (1978) (Pashman, J., dissenting), *cert.* den. 439 *U. S.* 997, 99 *S. Ct.* 598, 58 *L. Ed.* 2d 670 (1978).

Accordingly, I would remand this case for a *Franks* hearing at which defendant may attempt to substantiate his allegations of perjury. If he fails in this endeavor, the convictions will stand. Should he be successful, however, his convictions must be reversed and a new trial ordered.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, CLIFFORD, SCHREIBER and HANDLER—5.

*For remandment*—Justice PASHMAN—1.