**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1572-19

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

ELIZABETH SANCHEZ, a/k/a
ELY,

    Defendant-Respondents.

_____

Submitted September 20, 2021 – Decided September 27, 2021

Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-10-0825.

Joseph E. Krakora, Public Defender, attorney for appellant (Zachary G. Markarian, Assistant Deputy Public Defender, of counsel and on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Marc A. Festa, Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After pleading guilty, defendant appeals from her conviction for third-degree conspiracy to possess heroin, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-5(b)(3).[1] Defendant filed a motion to suppress and challenged search warrants authorized by Judge Marilyn Clark. A different judge (the motion judge) denied the motion concluding that defendant was not entitled to a Franks[2] hearing. After the motion judge denied reconsideration, defendant entered her guilty plea.

---

[1] A Passaic County Grand Jury charged defendant with one count of first-degree maintaining or operating a controlled dangerous substance (CDS) production facility, N.J.S.A. 2C:35-4 (Count One); one count of third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1) (Count Two); one count of third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(3) (Count Three); one count of third-degree of possession of heroin with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7(a) (Count Four); one count of second-degree possession of heroin with intent to distribute within 500 feet of public property, N.J.S.A. 2C:35-7.1(a) (Count Five); one count of third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (Count Six); one count of second-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(2) (Count Seven); one count of third-degree possession of cocaine with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7(a) (Count Eight); one count of second-degree possession of cocaine with intent to distribute within 500 feet of public property, N.J.S.A. 2C:35-7.1(a) (Count Nine), and one count of third-degree financial facilitation, N.J.S.A. 2C:21-25(a) (Count Ten). As part of the plea agreement, the State dismissed these charges. Defendant reserved her right to appeal from the denial of her motion to suppress. Defendant received a sentence of one year of probation.

[2] Franks v. Delaware, 438 U.S. 154 (1978).

On appeal, defendant raises the following argument for this court's consideration:

POINT I

[DEFENDANT] MADE A "SUBSTANTIAL PRELIMINARY SHOWING" THAT THE WARRANT AFFIDAVIT INCLUDED MATERIAL FALSE STATEMENTS AND SHE WAS THEREFORE ENTITLED TO A FULL FRANKS HEARING. (Raised below).

We disagree and affirm.

I.

A search executed pursuant to a warrant enjoys the presumption of validity. State v. Marshall, 199 N.J. 602, 612 (2009). "Doubt as to the validity of the warrant 'should ordinarily be resolved by sustaining the search.'" State v. Keyes, 184 N.J. 541, 554 (2005) (quoting State v. Jones, 179 N.J. 377, 388-89 (2004)). The defendant bears the burden of challenging the search and must "prove 'that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable.'" Jones, 179 N.J. at 388 (quoting State v. Valencia, 93 N.J. 126, 133 (1983)). Probable cause exists where, based on facts within the officers' knowledge and of which they had reasonably trustworthy information, there is "a reasonable ground for belief of guilt." Marshall, 199 N.J. at 610 (quoting State v. O'Neal, 190 N.J. 601, 612 (2007)).

Further, "[w]hen reviewing the issuance of a search warrant by another judge, the [motion judge] is required to pay substantial deference to the [issuing] judge's determination." State v. Dispoto, 383 N.J. Super. 205, 216 (App. Div. 2006) (citing State v. Kasabucki, 52 N.J. 110, 117 (1968)), modified on other grounds, 189 N.J. 108 (2007). Nonetheless, "under certain circumstances, a search warrant's validity may be questioned, in which case an evidential hearing may be afforded." Ibid. (citing Franks, 438 U.S. at 155-56).

Where, as here, a defendant challenges the veracity of a search warrant affidavit, a Franks hearing is required only "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56. The defendant "must allege 'deliberate falsehood or reckless disregard for the truth,' pointing out with specificity the portions of the warrant that are claimed to be untrue." State v. Howery, 80 N.J. 563, 567 (1979) (quoting Franks, 438 U.S. at 171).

To obtain a Franks hearing, a defendant's allegations should be supported by affidavits or other reliable statements; "[a]llegations of negligence or innocent mistake are insufficient." State v. Broom-Smith, 406 N.J. Super. 228,

241 (App. Div. 2009) (quoting Franks, 438 U.S. at 171). The allegations "must be proved by a preponderance of the evidence." Howery, 80 N.J. at 567-68. A defendant must also demonstrate that absent the alleged false statements, the search warrant lacks sufficient facts to establish probable cause. Id. at 568. If a search warrant affidavit contains sufficient facts establishing probable cause even after the alleged false statements are excised, a Franks hearing is not required. Franks, 438 U.S. at 171-72.

A misstatement is considered material if, when excised, the warrant affidavit "no longer contains facts sufficient to establish probable cause" in its absence. Howery, 80 N.J. at 568 (citing Franks, 438 U.S. at 171). "If at such inquiry the defendant proves [a] falsity by a preponderance of the evidence, the warrant is invalid and the evidence seized thereby must be suppressed." Id. at 566.

If probable cause exists despite the errant information, the search warrant remains valid, and an evidentiary hearing is unnecessary. See State v. Sheehan, 217 N.J. Super. 20, 25 (App. Div. 1987). If the defendant meets the requisite threshold burden, however, the court must conduct a hearing. Ibid. In turn, "[i]f at such inquiry the defendant proves by a preponderance of the evidence that the affiant, deliberately or with reckless disregard for the truth, excluded material

information from the affidavit which, had it been provided, would have caused the judge to refuse to issue the warrant, the evidence must be suppressed." Id. at 26.

Because a search warrant is presumed valid, our "role is not to determine anew whether there was probable cause for issuance of the warrant, but rather, whether there is evidence to support the finding made by the warrant-issuing judge." State v. Chippero, 201 N.J. 14, 20-21 (2009). The issuing judge's probable cause determination "must be made based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously." Schneider v. Simonini, 163 N.J. 336, 363 (2000) (citing State v. Novembrino, 105 N.J. 95, 128 (1987)). Finally, we review a judge's ruling on a motion for a Franks hearing for abuse of discretion. Broom-Smith, 406 N.J. Super. at 239.

II.

Judge Clark authorized the searches relying on an affidavit submitted by Paterson Police Detective Keith Calderon. After reviewing his affidavit, the judge issued search warrants for 61-69 Park Avenue, Apartment 211 in Paterson, 40 Passaic Street, Apartment 1-A in Hackensack, a gold 2003 Mercedes Benz, and a blue 2005 Toyota.

Calderon stated that in June 2018, he met with a confidential informant whose reliable information and cooperation previously resulted in numerous narcotics arrests and convictions, as well as seizures of large quantities of drugs and drug proceeds. The informant told Calderon that he/she knew of two Hispanic men, "Skippy" and "Cuto," and a Hispanic woman, "Skippy's Girlfriend," who distributed crack cocaine and heroin from Apartment 211 of 61-69 Park Avenue in Paterson.

The informant explained to Calderon that he/she had purchased crack cocaine from the individuals several times in the past few months. The informant described Cuto as a "medium[-]skinned male, approximately [five foot five inches] in height," "weighing 230 pounds" in his "mid [forties]." Skippy drove a gold Mercedes Benz, and Skippy's girlfriend drove a blue Toyota and a white Honda. Calderon identified Skippy as Pedro Anaya[3] and Skippy's girlfriend as Elizabeth Sanchez. The informant later confirmed these identifications after being shown their photographs from law enforcement databases.

---

[3] Pedro Anaya was charged in the same indictment as committing the same offenses as defendant.

A-1572-19

The informant detailed the system for purchasing the CDS. The informant would call Skippy, request a quantity of drugs, then go to 61-69 Park Avenue to meet either Skippy, Skippy's girlfriend, or Cuto in either the foyer or outside the apartment to pick it up. The informant explained that either Skippy or Cuto would retrieve the CDS from their parked vehicles. The informant noted that Cuto is often the individual who conducts the CDS transactions from 61-69 Park Avenue, and that at night, Skippy receives a plastic bag from Cuto containing drug proceeds, which he would then bring to his girlfriend's residence before returning to 61-69 Park Avenue.

Calderon planned to conduct a controlled purchase of CDS from Anaya, Sanchez, and Hiram Ramos[4] with the informant's help. On the week of July 8, 2018, Calderon met with the informant at a predetermined location while Detective Sebastian Gomez surveilled the informant using the city's camera system and Detectives Jason English and Jovan Candelo established physical surveillance at the purchase location. Calderon gave the informant money to purchase a predetermined amount of heroin. The informant called Anaya's cellphone "in a manner in which [Calderon could] overhear the conversation."

---

[4] Hiram Ramos was also charged in the same indictment with committing the same offenses as defendant and Pedro Anaya.

A-1572-19

A man answered the phone, which the informant later identified as Anaya. The informant and Anaya agreed upon a price for the heroin and arranged the purchase.

The informant and Calderon traveled to 61-69 Park Avenue to purchase the heroin, where Ramos met him in front of the building and allowed him inside with a key. A minute later, the informant exited the building and returned to Calderon with the heroin. The informant explained that Ramos allowed him inside the building, and the two exchanged cash for heroin. Police tested the substance Ramos provided, which confirmed the substance was heroin.

That same week, Calderon and Candelo conducted surveillance at 61-69 Park Avenue. They observed a "dark-skinned male" engage in what appeared to be a drug deal. The male spoke on his cellphone, and two minutes later, the detectives observed Ramos open the main entrance door of the apartment building. The male handed Ramos money in exchange for a "small item," which, based on the informant's description of Anaya, Sanchez, and Ramos's dealings, they believed was a narcotics transaction. Approximately thirty minutes later, the detectives observed a gold Mercedes Benz driven by Anaya double-park in front of 61-69 Park Avenue. Ramos exited the building, walked to the car, and handed Anaya "a plastic bag . . . square in shape." The detectives believed that

A-1572-19

the bag contained drug sale proceeds based on the informant's description of prior buys. The detectives followed Anaya to 40 Passaic Street in Hackensack. Sanchez exited the building, entered the vehicle, then shortly exited and reentered the building. Anaya then returned to 61-69 Park Avenue and used a key to enter the building.

During that same week, the detectives conducted a second controlled purchase of CDS. Again, Detective Gomez surveilled the informant using the city's camera system, and Detectives English and Candelo established physical surveillance at the apartment building. The informant was again given money to purchase a specific amount of crack cocaine. The informant called Anaya, the two again agreed upon a price for the specific amount and arranged the purchase.

While Calderon and the informant were en route to 61-69 Park Avenue, English observed Sanchez exit a gold Mercedes Benz and enter 61-69 Park Avenue using a key. The informant arrived at 61-69 Park Avenue, parked near the building, and three minutes later, Detective Gomez saw Anaya exiting the building and entering the informant's vehicle. Shortly after, Anaya exited the informant's vehicle and returned to the building using a key. The informant then drove, while under surveillance, to a predetermined location to surrender the

10

crack cocaine. The informant noted that Anaya exited the building, entered his vehicle, and handed them the crack cocaine before returning to the building. Police tested the substance Anaya provided, which confirmed the substance was crack cocaine.

Again, during the week of July 8, 2018, Detectives Gomez and Calderon conducted surveillance at 61-69 Park Avenue. Detective English located a gold Mercedes Benz, blue Toyota, and white Honda parked near 61-69 Park Avenue. Detectives Gomez and Calderon observed Ramos exit the building with an object in his hand. A dark-skinned male walked towards Ramos, which Ramos "acknowledged . . . by slightly raising his head." The male handed money to Ramos in exchange for the object in Ramos's hand, and Ramos returned to the building. About thirty minutes later, the detectives observed Sanchez exit the building with a square-shaped plastic bag and enter a blue Toyota. Detectives English, Gomez, and Calderon followed Sanchez as she drove from the apartment building to 40 Passaic Street and observed Sanchez enter the residence with the bag.

Based upon this information, on July 19, 2018, Detective Calderon requested and obtained a "knock and announce" search warrant for Anaya, Sanchez, Ramos, 61-69 Park Avenue, Apartment 211, 40 Passaic Street,

11

Apartment 1-A, the gold Mercedes Benz, and the blue Toyota. On July 20, 2018, detectives executed the search warrants. Detectives English, Gomez, and Calderon arrested Ramos and Anaya at 61-69 Park Avenue, and a search of the apartment revealed "nine bricks of heroin, . . . a knotted bag containing suspected crack cocaine, and a knotted bag containing suspected cocaine," a total of $2,280 in cash, and drug paraphernalia. At 40 Passaic Street, Detectives Bailey and Montoya arrested Sanchez. Sanchez informed the officers that she had $920 in a Domino sugar container and $20,000 inside of a Kool-Aid container with a false bottom.

After the motion judge denied defendant's motion to suppress, she filed a motion for reconsideration based on evidence submitted purporting to demonstrate that the phone number called to arrange the controlled purchase of CDS was registered to a "Derrick Jeter."[5] Defendant provided telephone records subpoenaed from Sprint showing that on February 9, 2018, Sprint canceled the account associated with the phone number used to arrange drug transactions with Anaya in July 2018 for late payments. Additionally, defendant submitted telephone records subpoenaed from MetroPCS/T-Mobile showing that an

_____

[5] There is no connection to the baseball player who spells his name as Derek Jeter.

A-1572-19

account was opened for this number on June 8, 2018, registered with an account name of "Derrick Jeter" and a subscriber name of "Blue Jay." Both defendant's investigator and the Passaic County Prosecutor's Office called and spoke with Jeter, who stated that he did not have any knowledge of the matter or the individuals involved and refused a request to provide a statement. The motion judge denied reconsideration.

The motion judge considered the new information regarding Jeter and his ownership of the cellphone number. She explained that the evidence is not "game[-]changing to merit reconsideration because defendant has not established that . . . Jeter is not entirely connected with the defendants in this case." The motion judge noted that defendant provided no certification to support Jeter's statement, and "[j]ust because the number's no longer registered to the defendant and her codefendants doesn't necessarily show that . . . Jeter was not just trying to be as cautious as the defendants were given the nature of the drug dealing business." Additionally, the judge determined that the detectives provided sufficient corroborated information: the informant's identification of the defendant and her codefendants, including their vehicles, weights, and heights; confirmation of the informant's identification using photos in the police's database; confirmation of defendant and her codefendants'

criminal histories involving CDS; and two controlled purchases of CDS. Additionally, "police observed what appeared to be drug transactions by others at the target locations."

The motion judge concluded that defendant failed to demonstrate that the inclusion of the cellphone number "was a reckless disregard for the truth." The detectives corroborated that the number dialed was used to arrange two CDS transactions because the informant and the individual receiving the call to the cellphone number agreed on the price and specific amount of CDS and completed the transaction twice, suggesting that the number was "somehow affiliated . . . with the defendants." The motion judge determined that "the evidence does not show a willful misstatement by the police, nor that . . . Jeter is not a part of . . . defendant's operation," and that while Jeter may have stated that he had no affiliation with defendant and her codefendants, "[t]he fact that the defendants are very careful may explain why the number is now registered to Blue Jay and owned by . . . Jeter." Further, the judge noted that "the affidavit may have [at] best contained a misrepresentation or a misstatement," but there was "no evidence that . . . Calderon recklessly disregarded the truth to warrant relief under Franks," and even if the information was excised from the search

14

warrant affidavit, "there is certainly sufficient probable cause to allow the search warrant to be issued."

Defendant failed to make a substantial preliminary showing that the inclusion of the cellphone number in the warrant affidavit was a material falsity. And even if defendant satisfied her preliminary showing, which is not the case, and assuming further that the information was then excised from the affidavit, we conclude that the remaining information contained in the search warrant affidavit established sufficient probable cause. We, therefore, see no abuse of the motion judge's discretion by denying a <u>Franks</u> hearing.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION