827 A.2d 1143 (2003)
362 N.J. Super. 319
STATE of New Jersey, Plaintiff-Respondent,
v.
Nial WILSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 13, 2003.
Decided July 22, 2003.
*1145 Stephen M. Latimer, Hackensack, argued the cause for appellant (Loughlin & Latimer, attorneys; Mr. Latimer, of counsel and on the brief).
Russell J. Curley, Deputy Attorney General, argued the cause for appellant (Peter C. Harvey, Acting Attorney General, attorney for respondent; Mr. Curley, of counsel and on the brief).
Before Judges STERN, COLLESTER and ALLEY.
*1144 The opinion of the court was delivered by COLLESTER, J.A.D.
Defendant Nial Wilson and co-defendant Ronald Hall were indicted by an Atlantic County grand jury on three charges: third degree unlawful possession of a weapon (9mm handgun) contrary to N.J.S.A. 2C:39-5b (count one); fourth degree aggravated assault, pointing a firearm, contrary to N.J.S.A. 2C:12-1b(4) (count two); and second degree possession of a weapon for unlawful purpose, contrary to N.J.S.A. 2C:39-4a (count three). Following a jury trial, defendant was found guilty on November 19, 1997, of all three counts of the indictment. Co-defendant Hall was found guilty of only count one.
The incident giving rise to the charges took place shortly after 11 a.m. on June 12, 1996. At that time, George Philippou, a landscape manager for the Atlantic City Special Improvement District, was supervising a work crew of ten or eleven men who were performing landscaping and maintenance work on New York Avenue at the beach block adjacent to the Atlantic City Boardwalk. The crew was putting their equipment away and about to break for lunch when three shots rang out. Most of the crew dove for cover, but Philippou and Charles Richardson, a member of the crew, were frozen in their tracks. Richardson saw a man running down an alley onto New York Avenue being chased by another man. A cab suddenly appeared and the first man jumped into the back seat. Three more shots were fired. Philippou watched in shocked attention as the second man stood on the sidewalk holding his still smoking black 9mm gun. As the gunman walked down the street, he lifted up his shirt and put the gun in his waistband. Moments later, a dark blue Honda Accord with tinted windows and New York license plates drove out of the alley, picked up the gunman and drove off.
The Atlantic City police arrived within a few moments. Philippou and Richardson separately described the gunman as an African-American man about 6' tall with short hair and wearing black clothing. Philippou described the driver as an African-American man with dreadlocks. He also gave a partial license plate number for the Honda. The description of the men and the car were immediately sent out over the police radio.
Events unfolded rapidly. Officer James Davis was on bicycle duty nearby at Kentucky Avenue and the beach block when he heard the transmission. He saw an automobile matching the description in an *1146 Econo Lodge hotel parking lot, only a block from the scene of the shooting. Davis noted a parking validation ticket inside the windshield which indicated that the car was parked there just a few minutes earlier at 11:39 a.m. The car hood was still warm to the touch. Officer Davis went inside and spoke to the front desk clerk, who told him that two men came into the Econo Lodge office shortly before and paid $3 to park the car. The desk clerk described one of the men as about 5'7" tall with dreadlocks. He told Davis that a video surveillance camera in the front office recorded the transaction.
When David radioed his findings, other officers arrived. They viewed the security videotape of the two men who parked the Honda and observed that they left, heading for the Boardwalk. After broadcasting a description over the police radio, the officers fanned out to search the area. Davis went onto the Boardwalk and saw two men fitting a description of the shooter and the driver on a "people mover," which transported people on the Boardwalk between casinos. He summoned other officers, and they took defendant Wilson and Hall into custody. They were then advised over the police radio to transport them to the Econo Lodge parking lot.
In the interim, Philippou and Richardson had been taken by police to the Econo Lodge parking lot where they identified the Honda. After the police car pulled up with defendant and Hall in the back seat, they positively identified the defendant as the gunman and Hall as the driver. The police then used a set of car keys found in the defendant's pocket to open the Honda. A 9mm handgun was found under the driver's floor mat. Philippou identified the gun as the one he saw the defendant firing. Subsequent ballistic tests on the handgun matched spent shell casings found in the alley at the crime scene.
The same day Jean Docteur, an Atlantic City taxicab driver, came to the station and told Atlantic City police that the back passenger side of his taxicab had been hit by bullets. He said he picked up three men sometime about 11 a.m. and drove them to New York Avenue. One of the men got out and walked down an alley while the others remained in the cab. After Docteur heard gunshots, the men in the cab told him to drive away. He claimed that no one got into his cab after the gunshots.
No witnesses were presented by the defense. When both defendant and Hall did not appear the last day of the trial, the trial continued and they were both found guilty in absentia. Defendant remained a fugitive from justice for nearly three years. He was sentenced on August 25, 2000, to a term a term of seven years imprisonment with a three year period of parole ineligibility on the conviction for second degree possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4a); an eighteen month consecutive term of incarceration on the conviction for fourth degree aggravated assault (N.J.S.A. 2C:12-1b(4)); and a concurrent four year term of incarceration on the conviction for third degree unlawful possession of a weapon (N.J.S.A. 2C:39-5b).
On appeal defendant sets forth the following contentions:

POINT ITHE IDENTIFICATION OF APPELLANT BY RICHARDSON WAS UNDULY SUGGESTIVE AND TAINTED THE TRIAL.
1. THE SHOW UP IDENTIFICATION WAS IMPERMISSIBLY SUGGESTIVE.
2. THE UNDULY SUGGESTIVE SHOW UP TAINTED THE TRIAL.
3. THE TRIAL COURT'S CHARGE TO THE JURY ON *1147 IDENTIFICATION WAS IMPROPER AND INCOMPLETE AND IT DEPRIVED THE DEFENDANT OF A FAIR TRIAL.

POINT IITHE WARRANTLESS SEARCH OF THE VEHICLE VIOLATED THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 § 7 OF THE NEW JERSEY CONSTITUTION.
1. THERE WAS NO PROBABLE CAUSE TO SEARCH THE VEHICLE.
2. EXIGENT CIRCUMSTANCES DID NOT JUSTIFY THE SEARCH OF THE VEHICLE.

POINT IIITHE DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE JURY FAILED TO UNDERSTAND THE ESSENTIAL ELEMENTS OF OFFENSES CHARGED AND THEY WERE CONFUSED ABOUT THE DIFFERENCE BETWEEN CHARGES 2 AND 3(b) OF THE INDICTMENT.

POINT IVTHE COURT FAILED TO CORRECTLY CHARGE THE JURY ON THE ELEMENTS OF UNLAWFUL POSSESSION OF A WEAPON.
Defendant argues that his identification by Philippou and Richardson less than an hour after the incident while he was handcuffed in the back of the police car was unduly suggestive and violated his due process rights. See, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); State v. Michaels, 136 N.J. 299, 319, 642 A.2d 1372 (1994) ("[W]hen an identification is crucial to the prosecution of a criminal case, its reliability, and ultimate admissibility must be strictly tested through a searching pretrial hearing"). See also, State v. Clausell, 121 N.J. 298, 325-26, 580 A.2d 221 (1990).
Following a Wade hearing, the trial judge declared:
Now, clearly, when someone is brought in handcuffs either in the back of a police car or gotten out of a police car with considerable indicia that that person is in custody as a suspect there is an aspect of suggestibility to this. That is undeniable. That would be inherent in any type of show up. But the issue is whether under the circumstances presented it is unduly suggestive and I hold that it was not ... [T]he two witnesses were requested to observe and see whether they could make an identification. They were not told much of anything beyond that. Clearly, it was not said that these are the people can you identify them, or some impermissible conduct such as that, but rather, the essence of the request was to have the two witnesses see if they could, if they were in a position to identify the suspects who were apprehended. And there remains a need to act with some speed under the circumstances such as this. If these were not the individuals or if the witnesses were unable to identify the two defendants as the individuals allegedly involved, then, again, still out there on the street would have been a shooter and a wheel man that the police of the City of Atlantic City would have an absolute obligation and an absolute interest in endeavoring to locate as quickly as possible. So, there was some need to proceed in a relatively prompt fashion under the circumstances, to see whether any form of positive identification could be made.
So, under the totality of the circumstances, while clearly it was suggestive in that the defendants were brought back and clearly in custody and, thus, *1148 clearly suspects in an investigation, it was not unduly suggestive and I would conclude that the identification testified to was reliable, despite those elements of suggestibility, such that the jury may appropriately consider the matter and reach its own conclusions with respect to the identification.
So-called "show up" or one-on-one identifications made within a reasonably short time at the scene of the crime are permissible under the Wade doctrine. As stated by our Supreme Court in State v. Wilkerson, 60 N.J. 452, 461, 291 A.2d 8 (1972),
On or near-the-scene identifications have generally been supported on three grounds. They are likely to be accurate, taking place, as they do, before memory has faded. They facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent.
As noted by the trial judge, there is no question that there was suggestiveness present because the defendant was identified while seated and handcuffed in the back of a police car. However, such suggestive circumstances did not render the identification procedure per se improper and unconstitutional. See, State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988); see also, United States v. King, 148 F.3d 968, 970 (8th Cir.1998) ("necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive.") It was necessary for the police to take swift action to make an identification when shots were fired in a congested area and the public risk was great. Here the witnesses gave detailed descriptions of the men involved and the vehicle which was corroborated by the motel security videotape. The reliability of the identification was therefore strong. The findings of the trial judge as to reliability of the witnesses are entitled to considerable weight. State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973); State v. Scott, 236 N.J.Super. 264, 267, 565 A.2d 716 (App.Div.1989). We find no error in the admission of the out-of-court identifications for consideration by the jury.
Defendant next claims that the judge's charge to the jury on identification was inaccurate and insufficient. He notes that the judge referred to an in-court identification when neither Philippou nor Richardson identified him or Hall at the trial two years after the incident. He further argues that the charge should have been properly tailored to reflect the facts and circumstances of the out-of-court identification, including the fact that he was handcuffed in the police car at the time.
Since no objection was made to the identification jury charge, the standard of review is plain error. R. 2:10-2. State v. Green, 86 N.J. 281, 288-89, 430 A.2d 914 (1981); State v. Bogus, 223 N.J.Super. 409, 419, 538 A.2d 1278 certif. denied, 111 N.J. 567, 546 A.2d 497 (1988). Defendant's arguments do not meet that standard. It is obvious the trial judge misspoke when referring to an in-court identification, but the obvious slip of the tongue was harmless in light of the full charge and the facts put before the jury. Moreover, since no request was made by defendant for a factually "tailored" charge on identification, the trial judge was under no obligation to depart from the model charge. State v. Robinson, 165 N.J. 32, 43-44, 754 A.2d 1153 (2000); State v. Swint, 328 N.J.Super. 236, 260-61, 745 A.2d 570 (App.Div.) certif. denied, 165 N.J. 492, 758 A.2d 651 (2000); State v. Salaam, 225 N.J.Super. 66, 71-72, 541 A.2d 1075 (App.Div.1988).
*1149 Defendant claims another portion of the court's charge constituted plain error. He contends that the instruction for possession of a handgun for an unlawful purpose failed to follow State v. Villar, 150 N.J. 503, 511, 696 A.2d 674 (1997), which mandates the jury be told that they "may not convict based on their own notion of the unlawfulness of some other undescribed purpose." We disagree. The trial judge properly instructed the jury with respect to the four elements of the crime as contained in the model charge and told them that it was not permissible to consider any unlawful purpose other than that the defendant possessed the weapon with a specific purpose to shoot at an unnamed male, at Charles Richardson or at the taxicab. While the judge did not read the exact language from Villar, he satisfied its requirement. The slight departure from the language of Villar does not constitute error, much less plain error. State v. Brims, 168 N.J. 297, 306, 774 A.2d 441 (2001).
Defendant next argues that the jury verdict was a product of confusion and misunderstanding. The jury and individual members of the jury made numerous inquiries of the trial judge with respect to the applicable law of each of the three counts of the indictment including the requisite mental states and actions charged. The trial judge took pains to answer each and every question, and he recharged the jury as to the proper elements of the offenses charged. Nothing in the record suggests that the trial judge did not appropriately respond to the questions by the jury and clarify the issues they brought to his attention. State v. Conway, 193 N.J.Super. 133, 157, 472 A.2d 588 (App. Div.1984). We further note that defendant made no objection to the comments by the trial judge, and defense counsel participated with the prosecutor in assisting the court to formulate appropriate responses to the jury questions. There is no basis for this claim of reversible error.
We now address defendant's argument that the trial judge erred in failing to grant the motion to suppress. At the suppression hearing the State called Detective Daniel McCausland, who testified that after he responded to New York Avenue on June 12, 1996, he spoke with Richardson and Philippou. He related that they told him they saw a male run from the alley in the beach block firing several shots from a handgun toward an intended victim who jumped into a dark colored taxicab and drove away. The description of the shooter was of a black male about 6' tall wearing dark shoes and trousers who entered the passenger side of a dark-colored Honda with tinted windows bearing a New York registration for which a partial plate number was given. The driver of the Honda was described as a dark-skinned man with dreadlocks. Detective McCausland received further confirmation of the incident when he spoke to a man named Terence Sutton, who said he was standing at 157 South New York Avenue when he heard gunshots and saw a man run from the alley while a second man chased him and fired shots at him. Sutton's description of the shooter and the driver of the motor vehicle were essentially the same as that given by Richardson and Philippou. He described the vehicle as a dark blue Honda Accord or a "Lexus-type of vehicle" with tinted windows.
McCausland was still at the scene when he received a call from the police radio that a suspect vehicle was located about a block away at South Kentucky Avenue. He walked across a parking lot to the Econo Lodge Motel, and he saw a blue Honda Accord with tinted windows and a New York registration similar to the partial plate description given at the scene.
*1150 McCausland recalled numerous uniformed officers at the scene including Sergeant Levine and Captain Flipping. Sergeant Levine advised that he had spoken with the desk clerk and reviewed the security tape, which showed a blue Honda Accord pulling into the parking lot and two men matching the descriptions given by the witnesses getting out of the car and going into the motel office. Levine said that the tape also showed the men walking south on Kentucky Avenue toward the Boardwalk. At that point, Captain Flipping assigned officers in the Boardwalk area to conduct a search. McCausland called a police detective at the scene on New York Avenue and told him to bring over the witnesses to see if they could identify the vehicle. Richardson and Philippou arrived, and they both identified the Honda as the same car driven by the African-American man with dreadlocks who picked up the shooter at the scene.
Shortly thereafter, McCausland heard a report on the police radio that a store clerk on the Boardwalk told police that men entered his store, changed clothing and left right away. Within minutes other officers observed two suspects in the area of Indiana Avenue and the Boardwalk and removed them from the "people mover." The two suspects were handcuffed, placed in the back seat of a police car and driven to the Econo Lodge parking lot. After the men were identified by Richardson and Philippou, they were searched by uniformed officers. A set of Honda car keys were found. Captain Flipping directed that the keys be used to open the car door and to search inside for the weapon. A 9mm handgun was recovered and shown to the witnesses. While Richardson was unsure, Philippou said he believed it was the gun carried by defendant. The entire incident from the time of the shots to the recovery of the 9mm automatic weapon from the Honda Accord took only about one hour. No other suspects or possible confederates were sought after defendant and Hall were apprehended and the 9mm weapon recovered.
On cross-examination McCausland acknowledged that June 12, 1996, was a Wednesday, that the Atlantic County Courthouse was located some six to eight blocks from the Econo Lodge and that at no time prior to the entry into the Honda was an application made for a search warrant.
In this State there is no general automobile exception to the requirement of a search warrant. The justification for a warrantless automobile search requires both probable cause and exigent circumstances. State v. Cooke, 163 N.J. 657, 671, 751 A.2d 92 (2000). As stated by Justice Verniero,
[A]lthough we have previously acknowledged that there is a lesser expectation of privacy in one's automobile, [ ] we do not believe that those expectations are diminished to the point that they may constitute the sole justification for a warrantless search. [ ] Rather, the lessened privacy expectation is one factor, which, when combined with the existence of probable cause and the overall exigency of the situation, may justify the warrantless search.
[Id. at 670, 751 A.2d 92. Citations omitted.]
In the instant case we find the existence of probable cause was clearly established by the State's proofs at the suppression hearing. Philippou and Richardson were citizen-eyewitnesses. Their veracity and lack of bias is assumed. State v. Stovall, 170 N.J. 346, 362, 788 A.2d 746 (2002); State v. Davis, 104 N.J. 490, 506, 517 A.2d 859 (1986); State v. Kurland, 130 N.J.Super. 110, 114-15, 325 A.2d 714 (App.Div.1974). Their testimony *1151 gives further weight to their reliability. Both were in a position to make their observations, and they testified that they got a good look at both the men and their vehicle. Philippou even supplied a partial plate number. Their observations, separately related to the police, were strikingly similar. Corroboration of their initial descriptions was made by their later identification of the vehicle and the men at the Econo Lodge. Taken together with the other proofs produced by the State including the security tape, the eyewitness statements established a persuasive submission of probable cause that a crime was committed and that the defendant was involved in its commission.
Defendant argues that the hearing judge erred in finding exigent circumstances were presented in this case. He stresses the number of police officers to secure the vehicle in the motel parking lot and that both he and his co-defendant were in custody, handcuffed in a police car. He asserts that since the police did not believe there was another person involved, the potential for removal or destruction of evidence was non-existent. Finally, he underscores the proximity of the Atlantic City Courthouse where a Superior Court judge was available to hear and rule upon an application for a search warrant upon short notice or by telephone pursuant to R. 3:5-3(b).
Clearly, this warrantless search cannot be upheld on the basis of threat of destruction or removal of the evidence or upon the impracticality of obtaining a search warrant within a reasonable time. However, there are other circumstances sufficiently exigent to justify a warrantless search. In State v. Alvarez, 238 N.J.Super. 560, 568, 570 A.2d 459 (App.Div.1990), we synthesized the existing authority and gave a list of nine factors for consideration in determining whether there was a sufficient degree of urgency to permit an exception from the warrant requirement. Moreover, even these factors were not intended to exhaust all other factual considerations determining what may be "exigent" in a given factual setting. Id. at 569-72, 570 A.2d 459. As stated in Cooke:
We conclude by stating the obvious: the term "exigent circumstances" is, by design, inexact. It is incapable of precise definition because, by its nature, the term takes on form and shape depending on the facts of any given case. We reiterate that exigency in the constitutional context amounts to "circumstances that make it impracticable to obtain a warrant when the police have probable cause to search the car." [State v. Colvin, 123 N.J. 428, 437, 587 A.2d 1278 (1991).] It is that impracticability and the existence of probable cause to believe that the vehicle contains evidence of a crime, together with a lessened expectation of privacy in an automobile, that tips the balance in favor of condoning the warrantless search. Although the balance is a delicate one, we must attempt to maintain it to protect the rights and interests of all members of the community.
[Cooke, supra, 163 N.J. at 676, 751 A.2d 92.]
The factual setting in this case describes a public emergency and a law enforcement nightmare. Six shots were fired on a public street one block form the Atlantic City Boardwalk at 11:00 a.m. on an early summer morning. The risk of deadly harm to members of the public was heightened as events unfolded rapidly. The getaway car was located within minutes of the shooting and only a block away. The substantial likelihood was that an armed gunman and his accomplice were making their escape amidst the crowd on the Boardwalk.
*1152 When the men were apprehended, no gun was found. There was a real concern that the weapon was hidden or discarded in one of the almost innumerable places on or near the Boardwalk, possibly inside a casino or other public establishment, and the real danger that not only would evidence of a crime be lost but also that an automatic handgun could fall into malevolent, untrained or immature hands.
Our state law has long recognized the special significance of firearms and the threat they represent to public safety. See, e.g., State in the Interest of H.B., 75 N.J. 243, 245-47, 381 A.2d 759 (1977). A deadly weapon poses a special threat to both the public and police, and its presence is a significant factor in evaluating whether there are exigent circumstances which justify a warrantless search.
In State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981), police officers observed shotgun shells and an opaque plastic bag protruding from under the front passenger seat which turned out to contain a sawed-off shotgun. After the occupants were placed under arrest, the officers searched further and found additional weapons. The defense's contention was that once the defendants were out of the car, placed under arrest and handcuffed, there were no exigent or exceptional circumstances to justify a warrantless search. Rejecting this argument, the Supreme Court stated:
The unanticipated circumstances that gave rise to probable cause to search for concealed weapons developed swiftly. Given that the detectives had probable cause to believe that dangerous weapons were concealed in the passenger compartment of the vehicle, the vehicle's inherent mobility and the potential danger posed by the presence of weapons were sufficient exigent circumstances to justify a warrantless search. [ ]
These exigent circumstances do not dissipate simply because the particular occupants of the vehicle may have been removed from the car, arrested, or otherwise restricted in their freedom of movement. [ ] ... [W]hen there is probable cause to conduct an immediate search at the scene of the stop, the police are not required to delay the search by seizing and impounding the vehicle pending review of that probable cause determination by a magistrate.
[Id. at 234-35, 440 A.2d 1311.]
In State v. Esteves, 93 N.J. 498, 461 A.2d 1128 (1983), police officers investigating a report of a possible robbery in progress observed what appeared to be a small handgun between the two front seats of an unoccupied automobile parked in a store parking lot. Based on their observations, the officers searched the vehicle and found controlled dangerous substances. In upholding the search, the court stressed the special significance of dangerous weapons when they are the objects of a search.
Id. at 505, 461 A.2d 1128.
Also on point is State v. Martin, 87 N.J. 561, 436 A.2d 96 (1981), which involved an early morning armed robbery at a Friendly's ice cream store. Before the robbery, an employee saw one of the robbers get out of a Ford LTD station wagon while brandishing a handgun. The police were given the description of the car and within a short time found it parked and unoccupied. The police seized the vehicle and towed it to the local police station where a warrantless search yielded evidence which led to the convictions of defendants for armed robbery. Commenting on the matter of exigent circumstances, the Supreme Court stated:
The level of exigency in the circumstances surrounding this search was heightened by the fact that the police were actively involved in an on-going *1153 investigation shortly after the armed robbery and near to where it had occurred. The officers discovered the vehicle matching the description of the one used by the robbers, near the crime scene and within two hours of the crime. There was an urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery, before the suspects had an opportunity to leave the area or to destroy or dispose of other evidence.
[Id. at 570, 436 A.2d 96.]
Recently in State v. Hammer, 346 N.J.Super. 359, 788 A.2d 284 (App.Div. 2001), we upheld a warrantless search where the automobile was secured by the police and the suspects were in custody. A New Jersey State Trooper stopped a car for speeding and saw two bullets fall from the driver's coat as he got out of the car. The trooper removed all passengers from the vehicle and handcuffed them. Once back-up units responded, the interior of the car was searched for weapons. Cocaine and drug paraphernalia was found. After all of the occupants denied knowledge of the drugs, the trunk was searched. Additional cocaine and paraphernalia were located in a duffle bag and briefcase.
We rejected the defendant's contention that the search was illegal and unconstitutional. We found that the trooper's observation of bullets falling from the driver's coat justified an immediate search of the car's interior for weapons, and the subsequent discovery of cocaine taken together with the bullets formed a sufficient basis to search the trunk for weapons. Id. at 367-68, 788 A.2d 284.
In upholding the warrantless search we stated our holding as follows:
New Jersey does not require a police officer involved in a fluid, on-going criminal investigation on a busy highway to stop what he is doing, post a special detail to guard the vehicle, to obtain a warrant where to do so would endanger his life, or the lives of others. [ ] The fact that back-up assistance had arrived and secured the occupants does not mean that the exigency had dissipated... [I]n these circumstances, instead of searching the trunk on a dangerous highway, the trooper would have been justified in arresting the occupants and having his back-up officers transport them and the vehicle to the trooper's barracks where the search could proceed without a warrant.
[Id. at 370, 788 A.2d 284.]
In this case, as in Hammer, both suspects were in custody and the automobile under police control. It is clear that a search warrant could have been obtained within a short period of time. Hindsight reveals that the delay in searching the Honda while awaiting the issuance of a search warrant would not have presented a danger to public safety since the gun was in the car. But hindsight is a lawyer's and a judge's luxury. The police were confronted with a dangerous situation which was not dissipated by the arrest and search of the suspects. There remained an urgent need to locate a missing and, in all probability, loaded handgun to eliminate the potential for deadly harm in a vulnerable public area.
We conclude that there was both probable cause and exigent circumstances to permit the officers to search the automobile for the handgun. Therefore, no warrant was required, and the motion judge properly denied the motion to suppress.
Affirmed.