**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0436-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FARAD ANDREWS, a/k/a FRAD
ANDREWS, JAHAD PARKER, RODDY
WILLIAMS, NEHEMIAH N. HENDERSON,
NEHEMIAH A. HENDERSON, DOMINICK
C. PLUMMER, NAHEMIAH HENDERSON,
and FARD T. ANDREWS,

    Defendant-Appellant.

_____

Submitted May 1, 2018 — Decided August 1, 2018

Before Judges Sumners and Moynihan.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Indictment No.
14-09-2348.

Joseph E. Krakora, Public Defender, attorney
for appellant (Stephen W. Kirsch, Assistant
Deputy Public Defender, of counsel and on
the brief).

Robert D. Laurino, Acting Essex County
Prosecutor, attorney for respondent (Matthew
E. Hanley, Special Deputy Attorney
General/Acting Assistant Prosecutor, of
counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Farad Andrews appeals his conviction for first-degree robbery, N.J.S.A. 2C:15-1; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). He contends the trial judge committed plain error by giving a jury charge on the non-existent crime of first-degree attempted robbery, and erred in denying his Wade[1] motion to suppress the two victims' show-up identifications because the police did not properly memorialize the identification procedures. We disagree and affirm because the judge corrected the jury charge, and his decision not to suppress the show-up identifications was supported by his credibility findings that the Wade hearing testimony established they were reliable.

I.

Long-time male and female live-in companions were finished exercising in an Essex County park around 1:00 a.m., when two men, one of them pointing a handgun with a mask covering his face, demanded their possessions. When the unmasked assailant stated, "I know her, she's good," the other armed assailant

---

[1]  United States v. Wade, 388 U.S. 218 (1967).

lowered his mask for five seconds to reveal his face, and they both left. Moments later, the couple flagged down a police patrol car to report the robbery and to give a description of their assailants. After unsuccessfully searching for their assailants while riding in the patrol car, the couple returned home where the female, an Essex County Sheriff's Officer, retrieved her service weapon, and they drove back to the vicinity of the park to look for their assailants. After spotting two men they suspected were their assailants, the couple alerted the police by calling 911 and followed the men. Two or three police vehicles responded, and the two suspects were apprehended.

In the ensuing show-up identifications, the couple were separately asked if either of the two men were involved in the robbery. They both identified defendant as the person who lowered his mask and held the gun. Neither, however, identified the other suspect as the other assailant.

Defendant was subsequently indicted for first-degree "attempted" robbery;[2] second-degree unlawful possession of a weapon; second-degree possession of a weapon for an unlawful purpose; and fourth-degree possession of a defaced weapon,

---

[2] Defendant has not challenged the indictment charging him with the non-existent offense of first-degree attempted robbery.

3

N.J.S.A. 2C:39-3(d). At the trial, the jury found defendant guilty of all but the defacing charge. He was later sentenced to an aggregate term of eighteen years and six months, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Before us, defendant argues:

POINT I

THE JURY INSTRUCTIONS ON COUNT ONE WERE GIVEN FOR THE SECOND-DEGREE CRIME OF ATTEMPTED ROBBERY; THE DEFENDANT'S FIRST-DEGREE CONVICTION SHOULD BE REVERSED AND THE MATTER REMANDED FOR RETRIAL. (Not Raised Below).

POINT II

THE TRIAL COURT SHOULD HAVE SUPPRESSED THE SHOWUP IDENTIFICATIONS OF DEFENDANT BECAUSE POLICE REFUSED TO FOLLOW FULLY THE RECORDATION REQUIREMENTS OF STATE v. DELGADO[3] AND STATE v. HENDERSON[4] AND SIMPLY FAILED TO ASK EITHER OF THE EYEWITNESSES, WHO WERE A COUPLE THAT LIVED TOGETHER, WHETHER THEY HAD DISCUSSED THE MATTER AFTER THE INCIDENT BUT BEFORE IDENTIFYING DEFENDANT AT A SHOWUP AS ONE OF THE PERPETRATORS.

II.

We begin by addressing defendant's argument in Point I, which he raised for the first time on appeal. When a defendant fails to object to a jury charge at trial, we review for plain

---

[3]  188 N.J. 48 (2006).

[4]  208 N.J. 208 (2011).

4

error, and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Plain error, in the context of a jury charge, is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)). This is not the case here.

In reviewing any claim of error relating to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005). A defense attorney's failure to object to jury instructions not only "gives rise to a presumption that he did not view [the charge] as prejudicial to his client's case," State v. McGraw, 129 N.J. 68, 80 (1992), but it is also "considered a waiver to object to the instruction on appeal," State v. Maloney, 216 N.J. 91, 104 (2013). Even so, we consider the argument on the merits, given that appropriate and proper jury charges are essential to a fair trial. State v. Savage, 172 N.J. 374, 387 (2002).

5

Defendant argues the appropriate charge was for either a first-degree armed robbery — which requires a weapon and a demand for money (explicit or implicit) but not the actual receipt of the stolen money — or second-degree attempted armed robbery — if the demand for money never actually occurred. He argues the charge given was for second-degree attempted robbery, and, therefore, the first-degree robbery conviction should be reversed. We disagree.

There is no dispute that the court erred by instructing the jury on first-degree attempted robbery, which does not exist, by stating:

> If you find that the [S]tate has proven beyond a reasonable doubt that the defendant committed the crime of attempted robbery as I have defined it to you, but if you find that the [S]tate has not proven beyond a reasonable doubt that the defendant was armed with, used, or purposely threatened the . . . immediate use of a deadly weapon at the time of the commission of the attempted robbery, then you must find the defendant guilty of attempted robbery in the second-degree.
>
> If you find that the [s]tate has proven beyond a reasonable doubt that the defendant committed the crime of attempted robbery and was armed with a deadly weapon, or used, or threatened the immediate use of a deadly weapon at the time of the commission of the robbery, then you must find the defendant guilty of attempted robbery in the first-degree.

The error, however, was corrected after the jury presented the question to the court: "What is the difference between first-degree attempted robbery and second-degree?" In response, the court re-explained the elements of attempt:

> First, that the defendant had the purpose to commit the crime of robbery; and that the defendant purposely did or omitted to do anything which, under the circumstances a reasonable person who believed them to be, is an act or omission that is a substantial step in the course of conduct planned to culminate in his commission of the crime of robbery.

The court then reinstructed the jury on the elements of robbery by stating "a section of our statute provides that an attempted robbery is a crime of the second-degree except that it is a crime of first-degree if the actor is armed with, or uses, or threatens the immediate use of a deadly weapon". Following this clarification, the jury convicted defendant of first-degree robbery and the other noted offenses.

The court's re-instruction is consistent with N.J.S.A. 2C:5-4(a), which provides that an "attempt or conspiracy to commit a crime of the first degree is a crime of the second degree," except for an attempt to commit murder or terrorism. And our criminal code recognizes "attempted robbery" as a predicate offense for felony murder, and because "the Model Penal Code suggests that attempted robbery is an appropriate

7

charge when a defendant is apprehended before reaching the potential robbery victim." State v. Farrad, 164 N.J. 247, 263 (2000). Only where there is no evidence of a completed theft must the court "instruct the jury on the law of attempt as an element of robbery." State v. Dehart, 430 N.J. Super. 108, 119 (App. Div. 2013).

Because the court ultimately gave the proper jury charge on first-degree robbery, there was neither error nor an unjust result. The evidence reveals that defendant pointed a gun at the couple so as to threaten them with immediate bodily injury if they did not turn over their valuables. Even though defendant and his accomplice decided not to go through with the theft after the latter recognized the female victim, there was an attempt applied to the theft, which supports a verdict of first-degree robbery.

III

In point II, defendant argues that when the detective failed to record whether the couple were asked if they discussed the matter between themselves prior to their respective show-up identifications of defendant, the detective failed to comply with the recordation requirements for identification procedures, and therefore, the identifications should have been suppressed as impermissibly suggestive and unreliable.

A show-up identification is essentially a single-person lineup that occurs at or near the scene of the crime shortly after its commission. Henderson, 208 N.J. at 259. The circumstances of a show-up identification are, to some extent, inherently suggestive. Adams, 194 N.J. at 204. Nonetheless, a show-up identification may be admitted at trial if it is otherwise reliable. Ibid.

Concerned with "safeguarding evidence and enhancing the reliability of the truth-seeking function of the trial," law enforcement officers must "make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony." Delgado, 188 N.J. at 59-60 (quoting State v. Earle, 60 N.J. 550, 552 (1972)). Because "[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country," the Court in Delgado held that "as a condition to the admissibility of an out-of-court identification," law enforcement officers were required to make "a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results. Id. at 60, 63.

The <u>Delgado</u> ruling was codified in <u>Rule</u> 3:11(c), which, in pertinent part, requires recordation of an out-of-court identification as follows:

> (1) the place where the procedure was conducted;
>
> (2) the dialogue between the witness and the officer who administered the procedure;
>
> (3) the results of the identification procedure, including any identifications that the witness made or attempted to make;
>
> . . . .
>
> (6) the identity of persons who witnessed the live lineup, photo lineup, or showup;
>
> (7) a witness' statement of confidence, in the witness' own words, once an identification has been made; and
>
> (8) the identity of any individuals with whom the witness has spoken about the identification, at any time before, during, or after the official identification procedure, and a detailed summary of what was said. This includes the identification of both law enforcement officials and private actors who are not associated with law enforcement.

If the record lacks the important details required by <u>Rule</u> 3:11(c), the court "may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification." <u>R.</u> 3:11(d).

10

When reviewing an order denying a motion to bar an out-of-court identification, our standard of review "is no different from our review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). We accord the court's findings regarding the impermissible suggestiveness of the identification procedure "considerable weight." Adams, 194 N.J. at 203 (quoting State v. Farrow, 61 N.J. 434, 451 (1972)). "The findings of the [court] as to reliability of the witnesses are [also] entitled to considerable weight." State v. Wilson, 362 N.J. Super. 319, 327 (App. Div. 2003). We accept those findings of the court that are "supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)).

At the pre-trial Wade/Delgado hearing to determine whether the show-up identifications were impermissibly suggestive, the judge heard testimony from the detective who, along with his sergeant, conducted the show-ups. He stated that prior to their separate show-ups, the victims were separated, placed into different patrol vehicles, and were told "that just because we're showing persons in front of them, that these persons may or may not be the persons who robbed them, and they are under no

11

obligation to pick one."  During both show-ups in a well-lit area — a little over an hour after the incident — the handcuffed suspects were in separate police vehicles with another officer. The female victim stated she was "90 percent" certain that defendant was one of the assailants.  The male victim stated he was "a hundred percent positive" that defendant was one of the assailants.  After defendant was identified, a similar show-up of the other suspect was performed; neither victim identified him as one of the assailants.  The detective did not recall if he had asked either victim if they had spoken to one another about the suspects or "any type of identification" of the suspects.

The detective gave detailed testimony about the "Show-up Identification Procedures Worksheet"[5] he completed for both victims, and explained why he omitted answering the following questions:

> **Number Ten** asked, "Names of other witnesses to [show-up] procedure"; he stated the question was left blank because the detective believed that his response to question nine, where he mentioned the officers "who conducted the show-up," was also responsive to question ten.

> **Number Thirteen** asked, if "an identification has been made, did you obtain and record

---

[5]  In compliance with <u>Delgado</u> and <u>Rule</u> 3:11(c).

12

witness statement of confidence . . . at the time of the procedure"; he stated it was unanswered because, normally, they would take the complainant to their headquarters to record an audio statement, which was not possible because the case was handed over to the County Sheriff's Department because the robbery took place in a county park.

**Number Fourteen** asked, if he instructed the "witness not to discuss the identification procedure, whether an identification was made or not, with any other witness or witnesses, or obtain information from other sources"; he stated that he instructed both witnesses not to discuss the procedure with anyone "[i]mmediately after the show[-]up," but he failed to answer the question.

**Number Fifteen** asked, "Did you ask witness if he/she had discussed identification of suspect with anyone before or during the identification procedure (Note: this includes both police officers and private actors)"; he stated his failure to record their answers was "just an oversight," and he did not recall what their answers were.

**Number Sixteen** asked, if yes to fifteen, "did you obtain a detailed summary from witness of what was said?"; as with question fifteen, he stated his failure to record their answers was "just an oversight," but he did not recall the response.

**Number Seventeen** asked, if "[y]es to [question fifteen], "did you identify the people with whom the witness discussed the identification?"; he stated he did not recall their answers.

13

A-0436-163

> **Number Eighteen** asked, if there was any additional dialogue between the witness and the other officer(s) concerning the identification not recorded in the worksheet; he stated that although left blank, to his knowledge, there was no other dialogue.

At the hearing's conclusion, the judge found that "the written documents submitted memorializing the identification procedures in this case, as supplemented by the testimony of [the detective]," were sufficient to establish that the show-up identifications complied with Delgado, because the detective testified under oath, subject to cross-examination; the location and procedure of the show-up was documented in writing and supplemented on the record; and the dialogue between the detective and the victims was testified to. He stated, "the additional questions that . . . were included . . . on the forms may be helpful, but they're not required for compliance with [Delgado], and the [c]ourt finds that the testimony of the officer as to what he affirmatively recollects as to being exchanged was credible." The judge additionally held that the "oversight" of not filling out certain parts of the forms would go to the weight of the evidence, not to its admissibility, and did not warrant suppressing the identifications. Hence, the judge denied the motion to suppress the show-up identifications.

14

In light of the discretion given to the judge's credibility assessment of the detective's testimony concerning the show-up identifications, we see no reason to disturb his finding that the identifications were reliable. Understandably, defendant points to the unanswered questions on the worksheet to support his argument that the show-up identifications were inadmissible. We, however, are satisfied with the court's credibility finding that the detective's testimony cleared up the gaps in the worksheet and that the identifications should not have been suppressed. We further agree with the judge that the unanswered worksheet questions were fodder for argument before the jury as to why it should consider the identifications lacking in credibility, and not a basis to preclude their admissibility.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-0436-163