**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4874-18T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

NATHANIEL E. PRICE,
a/k/a JOSH DURHAM,
and JOSHUA DURHAM,

      Defendant-Appellant.

_____

Argued November 16, 2020 - Decided January 28, 2021

Before Judges Messano and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 17-04-0301.

Laura B. Lasota, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Laura B. Lasota, of counsel and on the briefs).

Steven Cuttonaro, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Steven Cuttonaro, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress evidence, defendant Nathaniel Price accepted the State's plea offer and pled guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). In accordance with the plea agreement, the trial court sentenced defendant to a twenty-four-year prison term, subject to the No Early Release Act (NERA).[1] Defendant now appeals the trial court's denial of his suppression motion and its June 14, 2019 sentencing decision. We affirm.

I.

On April 19, 2017, a Union County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a) (count one); second-degree unlawful possession of a weapon, a handgun, N.J.S.A. 2C:39-5(b)(l) (count two); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(l) (count three). These charges arose from the fatal shooting of Tyquan Johnson in Roselle on January 21, 2017.

---

[1] The court also imposed a five-year prison term for each weapon offense, both terms to run concurrently with the twenty-four-year prison term.

A-4874-18T1

On April 9, 2019, the trial court heard defendant's motion to suppress evidence concerning a handgun discovered during a warrantless search of a shed located in the backyard of the home[2] (the subject residence) where the shooting occurred. Ballistics analysis matched DNA found on the handgun with defendant and revealed previously recovered projectiles had been fired from the handgun.

At the suppression hearing, the State presented the testimony of Officer Nazeet Hurling of the Roselle Police Department. He testified to the following facts. In the early morning hours of January 21, 2017, Roselle police responded to a reported shooting at the subject residence on Rivington Street in Roselle. The shooting occurred at approximately 2:33 a.m. in front of the subject residence. Officer Hurling arrived at the scene around a half hour after the shooting; at that time, he learned from other officers that a male victim had been shot multiple times by a suspect, described as a black man with dreadlocks, wearing dark-colored clothing. Other officers informed Officer Hurling that the suspected shooter had fled "[t]hrough the rear yard" of the subject residence.

---

[2] The record does not indicate whether defendant owned or leased the home, or simply lived there. At his suppression hearing, defendant testified the residence was his "home" and that he resided there.

A-4874-18T1

Officer Hurling spoke with witnesses and secured the perimeter of the crime scene until his supervisor told him to "check the surrounding areas," including the backyard through which the suspect reportedly fled. Around 6:40 a.m., Officer Hurling commenced "canvassing the yard" in search of "a suspect, any possible victims, or any evidence of the crime that had taken place." By this point, approximately four hours had elapsed since the shooting occurred.

While canvassing the yard, Officer Hurling "noticed . . . a shed towards the rear of the yard" and "walked over to . . . look into the shed" to check for the suspect, potential victims, and evidence. Approaching the shed, Officer Hurling noticed the shed's doors were "[o]pen and worn," and from the outside of the shed, used his flashlight to illuminate the inside. From this vantage point, he observed "tools, bike parts, an array of things." He estimated the shed was "approximately . . . four or five feet wide" and "about seven feet in length"; however, he could not see the entire interior of the shed from the outside.

Officer Hurling then entered the shed, taking four or five steps into its interior. Using his flashlight for illumination, he looked around the shed until he "caught . . . like a glare from a metal object." Stepping closer towards the glare, Officer Hurling "saw . . . the grip of a firearm. A handgun[,]" amongst

some tools. Upon learning of the discovery of the handgun, Officer Hurling's supervisor told him "not to touch anything, leave everything the way it is."

At 8:18 a.m., Detective Rudolfo Correia of the Union County Prosecutor's Office telephonically applied for a search warrant for the subject residence and the rear shed, as well as for the victim's 2003 Acura. In this telephonic application, Detective Correia stated that during a sweep, police had found a handgun in plain view in the shed. A judge approved the warrant at 8:28 a.m., and the police seized the handgun during the execution of the search warrant.

The trial court denied defendant's motion to suppress in an order dated April 12, 2019. In a written opinion, the trial court initially rejected the State's argument that the exigent-circumstances doctrine, the emergency-aid doctrine, and the plain-view doctrine all applied and each justified the warrantless search of the shed. Nevertheless, the court denied defendant's motion, finding the independent source doctrine and the inevitable discovery doctrine both applied, rendering the handgun admissible. The court also rejected defendant's request for a Franks[3] hearing, which defendant requested as part of his motion to suppress.

---

[3] Franks v. Delaware, 438 U.S. 154 (1978).

A-4874-18T1

After the trial court sentenced defendant, he filed this appeal, presenting the following points of argument:

POINT I

THE EVIDENCE FOUND IN THE SHED MUST BE SUPPRESSED AS THE FRUIT OF AN ILLEGAL SEARCH BECAUSE POLICE UNLAWFULLY ENTERED THE SHED AND THEN RELIED ON WHAT THEY SAW IN OBTAINING A SEARCH WARRANT.

A.    The Independent Source Doctrine Did Not Cure The Taint Of The Illegal Search.

B.    Similarly, The Evidence Is Not Admissible Pursuant To The Inevitable Discovery Doctrine.

POINT II

THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A FRANKS HEARING.

POINT III

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND MUST BE REDUCED.

After a careful review of the record and the applicable principles of law, we reject defendant's arguments and affirm; however, we affirm the denial of defendant's suppression motion for different reasons than expressed by the trial

6

court.  See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (stating an appellate court is "free to affirm the trial court's decision on grounds different from those relied upon by the trial court").  Specifically, we conclude that Officer Hurling was lawfully present in the shed due to the exigent circumstances exception to the warrant requirement, and upon lawfully entering the shed, found the gun in plain view.

II.

We employ a deferential standard in reviewing a trial court's ruling on a motion to suppress.  State v. Zalcberg, 232 N.J. 335, 344 (2018).  The trial court's factual and credibility findings will be set aside "only when [the] court's findings of fact are clearly mistaken . . . [and] the interests of justice require the reviewing court to examine the record, make findings of fact, and apply the governing law."  Ibid. (alterations in original) (quoting State v. Hubbard, 222 N.J. 249, 262-63 (2015)).  We use a de novo standard to review legal issues. Ibid.

Both the United States Constitution and the New Jersey Constitution guarantee freedom from unreasonable searches and seizures by the government. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "one of

7

the 'few specifically established and well-delineated exceptions to the warrant requirement.'" State v. Gonzales, 227 N.J. 77, 90 (2016) (citation omitted). One such exception is the plain-view doctrine, which allows seizures without a warrant if an officer is "lawfully . . . in the area where [the officer] observe[s] and seize[s] the incriminating item or contraband, and it [is] immediately apparent that the seized item is evidence of a crime." Id. 227 N.J. at 101.

In addition to the plain-view doctrine, the State relies on the exigent-circumstances exception to the warrant requirement to justify the search of the shed located in the backyard of the subject residence. The existence of probable cause and exigent circumstances "trumps the right of privacy and the requirement of a search warrant." State v. Laboo, 396 N.J. Super. 97, 104 (App. Div. 2007). While the doctrine does not fit into "neatly defined contours," an officer's failure to secure a warrant is excused by the existence of probable cause and exigent circumstances. State v. Cassidy, 179 N.J. 150, 160 (2004) abrogated on other grounds by State v. Edmonds, 211 N.J. 117 (2012).

Probable cause has been defined as a "well-grounded suspicion that a crime has been or is being committed." State v. Nishina, 175 N.J. 502, 515 (2003). Probable cause exists where facts within the officer's knowledge are sufficient to allow a "person of reasonable caution" to believe that an offense

has been or is being committed. State v. Moore, 181 N.J. 40, 46 (2004) (quoting Schneider v. Simonini, 163 N.J. 336, 361 (2000)). It is "more than mere suspicion but less than legal evidence necessary to convict." Sanducci v. City of Hoboken, 315 N.J. Super. 475, 480 (App. Div. 1998).

The application of exigent circumstances "demands a fact-sensitive, objective analysis." State v. Nishina, 175 N.J. 502, 517 (2003); see also State v. DeLuca, 168 N.J. 626, 632 (2001) (finding that application of the exigent-circumstances exception demands a fact sensitive, objective analysis); Riley v. California, 573 U.S. 373, 402 (2014) (finding that the exigent circumstances analysis is necessarily case-by-case and fact sensitive). Moreover, there is an immediate need to search where there is a realistic possibility that someone may remove evidence from the scene. State v. Cooke, 163 N.J. 657, 673-74 (2000) (finding exigent circumstances justified search of an automobile), abrogated on other grounds by State v. Witt, 223 N.J. 409 (2015). Where inaction due to time needed to obtain a warrant creates a substantial likelihood that the police or members of the public will be exposed to danger, or that evidence will be destroyed or removed from the scene, exigent circumstances exist. State v. Johnson, 193 N.J. 528, 553 (2008).

> Generally, when the State invokes the exigent-
> circumstances exception to the search warrant

requirement to justify a warrantless search, it must prove by a preponderance of the evidence that (1) the search was premised on probable cause and (2) law enforcement acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant.

[State v. Manning, 240 N.J. 308, 333 (2020).]

We have "long recognized the special significance of firearms and the threat they represent to public safety." State v. Wilson, 362 N.J. Super. 319, 333 (App. Div. 2003). "A deadly weapon, such as a gun, poses a 'special threat' to both the public and police, and the presence of one is a significant factor in evaluating whether there are exigent circumstances which justify a warrantless search." Ibid.

In State v. Diloreto, we held that knowledge of a missing gun provided exigent circumstances to search a vehicle, notwithstanding the occupant's arrest. State v. Diloreto, 362 N.J. Super. 600, 627 (App. Div. 2003), aff'd, 180 N.J. 264 (2004). We noted that when a gun is missing, there is "a real danger" that it can fall into "malevolent, untrained, or immature hands." Id. at 628 (quoting Wilson 362 N.J. Super. at 333). See State v. Minitee, 210 N.J. 307, 322 (2012) (finding exigent circumstances where two perpetrators were potentially armed, on the run, and the weapon used to perpetrate the crime was unsecured).

In rejecting the State's argument that the exigent circumstances exception applied in this case, the motion judge concluded "the exigency created by the flight of the suspect from the immediate area had subsided."  We disagree.  Defendant remained at large at the time of the search.  The murder weapon, a potentially loaded handgun, remained unrecovered at the time of the search.  Those facts and the dark shed, potentially hiding an armed assailant, constituted a clear danger and ongoing exigency.  The record clearly establishes exigent circumstances at the time Officer Hurling entered the shed and observed the gun in plain view.  See DeLuca, 168 N.J. 632–33; Minitee, 210 N.J. at 322.  In fact, we are satisfied that Officer Hurling would have been derelict in the performance of his duties had he not entered the shed when he did.  See State in Interest of H.B., 75 N.J. 243, 250 (1977).

We agree with the State regarding what the record shows the police knew when Officer Hurling entered the shed in the backyard of the subject residence.  At that point, the police knew that a murder had been committed at approximately 2:30 a.m., and that the murderer had fled the scene through the backyard of the subject residence.  In the rear of the backyard, police came upon a dilapidated, unkempt, and worn shed with doors conspicuously open.  The shed

11

stood along the flight path of the suspect. Importantly, the police knew that neither the gun nor their primary suspect had been secured.

Officer Hurling testified that, from the outside of the shed, he was not able to see the entire interior of the shed because "there was stuff all over the place." He therefore stepped into the shed "to make sure there was no one in there."

The record clearly reflects that inside of the dark, dilapidated shed, the murder suspect could have been hiding, waiting for an opportunity to either escape, take a hostage, or harm the police. In addition, in the process of fleeing the scene, the suspect could have discarded evidence in the shed – particularly the murder weapon, a presumptively loaded and unsecured gun – and in his haste to flee the scene, left the shed doors conspicuously open.

The prospect that the suspect may have hidden the murder weapon in the shed gave rise to a very real exigency. The suspect could have returned to the scene for the gun at any time. The crime scene, and the shed in particular, was inherently difficult to secure. The rear yard was surrounded by residential buildings, and encircled by a fence that was no more than four feet tall. The passage of time itself created unique exigencies. As time passed, the danger of the murder weapon – a potentially loaded handgun – falling into "malevolent, untrained, or immature hands," Wilson, 362 N.J. Super. at 333, increased

A-4874-18T1

dramatically, given its location in an open shed of a back yard encircled by a fence that was no more than four feet tall.

This was the true exigency that confronted police and justified the intrusion into the shed whereupon the gun was observed in plain view. It was not the fading exigency of the defendant's flight, but the risk of harm posed to both police and the public by a dark, worn-down shed that stood with its open door. Upon entering the shed under this exigency, Officer Hurling observed the gun in plain view without manipulating the scene. Seizure of property in plain view "is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Texas v. Brown, 460 U.S. 730, 741-42 (1983). In light of the murder committed only four hours before at the subject residence, the report that the murder suspect fled through the backyard near the shed with an open door, and the knowledge the murder weapon remain unrecovered, there was clearly probable cause to associate the handgun with the subject murder.

III.

Defendant next argues that trial court erred in denying his motion for a hearing under Franks, where the United States Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

[Id. at 188.]

New Jersey has adopted the use of a Franks hearing. See, e.g., State v. Smith, 212 N.J. 365, 413 (2012). However, "[s]uch a hearing is required only if the defendant can make a substantial preliminary showing of perjury." State v. Howery, 80 N.J. 563, 583 n.4 (1979). "He must allege 'deliberate falsehood or reckless disregard for the truth,' and those allegations must be supported by an offer of proof." Ibid. (quoting Franks, 438 U.S. at 155). "[A] Franks hearing is not directed at picking apart minor technical problems with a warrant application; it is aimed at warrants obtained through intentional wrongdoing by law enforcement agents." State v. Broom-Smith, 406 N.J. Super. 228, 240 (App. Div. 2009).

Moreover, the allegedly false statements must have been material to the finding of probable cause. Howery, 80 N.J. at 583 n.4. In other words, the defendant must demonstrate that absent the alleged false statements, the search warrant lacks sufficient facts to establish probable cause. Id. at 568. If a search warrant affidavit contains sufficient facts establishing probable cause even when the alleged false statements are excised, no Franks hearing is required. Franks, 438 U.S. at 171-72.

We review a trial judge's decision on whether to grant a Franks hearing for an abuse of discretion. State v. Broom-Smith, 406 N.J. Super. 228, 239 (App. Div. 2009). Here, the trial court determined that "the equivalent of a Franks hearing was held in connection with [the] court's review" of the independent source exception where it found that "ample information was provided to support the probable cause finding and the issuance of the search warrant, setting aside the information obtained as a result of the warrantless search." Additionally, the court found, "the facts adduced at the hearing, and other information contained within the record, do not establish that officers made any false statements knowingly or intentionally, or with reckless disregard for the truth, in the warrant application."

Defendant argues that he was entitled to a <u>Franks</u> hearing, contending he made a preliminary showing that the application for the warrant contained false information; specifically, the police stated they observed the gun in plain view when in reality, Officer Hurling observed it only upon conducting an unlawful search of the shed. Since we concluded that exigent circumstances justified Officer Hurling's entry into the shed, where he observed the hand gun in plain view, defendant's contention, that the State's search warrant application contained a material misstatement as to his plain-view observation of the gun, clearly lacks substantive merit.

## IV.

Defendant's final challenge pertains to his sentence, which he contends is "manifestly excessive and must be reduced." We disagree.

"Appellate courts review sentencing determinations in accordance with a deferential standard." <u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014). The sentence must be affirmed, unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

A-4874-18T1

[Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We "may not substitute [our] judgment for that of the trial court." State v. Natale, 184 N.J. 458, 489 (2005) (quoting State v. Evers, 175 N.J. 355, 386 (2003)). Thus, we must affirm the defendant's sentence, even if we would have arrived at a different result, as long as the trial court properly identified and balanced the aggravating and mitigating factors. Ibid. Furthermore, a sentence imposed pursuant to a plea agreement is presumptively reasonable. Fuentes, 217 N.J. at 70-71.

As part of its sentencing decision, the trial court found aggravating factors three, six, and nine applied, and that no mitigating factors applied. The court found aggravating factor three, "[t]he risk that the defendant will commit another offense[,]" N.J.S.A. 2C:44-1(a)(3), applied "based on [defendant's] prior drug use, [and] his extensive juvenile record[,]" which included "[fourteen] adjudications as a juvenile including assaults, resisting, receiving stolen property." The court also noted here that defendant had been charged with aggravated assault while in jail for this matter, which contributed to the court's finding of aggravating factor three. The court deemed the weight of this factor "very strong."

The court found that aggravating factor six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted[,]" N.J.S.A. 2C:44-1(a)(6), applied based on defendant's one adult conviction for second-degree conspiracy to commit robbery, for which defendant served a prison term. The court also noted that defendant additionally had one parole violation as an adult. However, because defendant's "juvenile record [was] longer than his adult record[,]" the court determined this factor did "not weigh . . . in an overly heavy fashion[.]"

Finally, the court determined a "strong" aggravating factor nine, "[t]he need for deterring the defendant and others from violating the law[,]" N.J.S.A. 2C:44-1(a)(9), applied. The court cited "the need to deter this defendant," who "had the benefit of probation as a juvenile, but . . . also has been in state prison. It still has not deterred him from engaging in this type of criminal behavior." The court further noted "a general need to deter this type of behavior absolutely applies."

After stating it found no mitigating factors, the trial court concluded that it was "clearly convinced that the aggravating factors . . . substantially outweigh the non-existing mitigating factors." The court added, "though a greater sentence could be imposed, I will give this defendant the benefit of the plea

agreement in this case." The court then sentenced defendant accordingly, imposing a twenty-four-year prison term for the aggravated manslaughter conviction with a NERA parole ineligibility period of twenty years, four months, and twenty-six days, and two concurrent five- year prison terms for the two weapons offense convictions.

Defendant contends the trial court "improperly relied on [his] prior criminal record as the basis for applying the [three] aggravating factors it found[,]" and "[t]herefore, [his] sentence should be vacated and the matter remanded for resentencing." He argues that because the three aggravating factors were "entirely based on defendant's prior criminal record, they should have each been afforded minimal weight." According to defendant, "Had the trial court properly weighed the aggravating factors, it would have found that a lesser term would have been more than appropriate in the instant case."

We are convinced that the trial court's application of aggravating factors, three, six, and nine was amply supported by the record, which detailed defendant's extensive juvenile and adult criminal history. Additionally, we fail to see how "affording minimal weight" to the aggravating factors would lead to a lesser sentence when balanced against the non-existent mitigating factors.

The trial court did not abuse its discretion in sentencing defendant according to the plea agreement. This sentence reflects a proper assessment and consideration of the aggravating factors and the absence of any mitigating factors. The trial court did not impose an excessive sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4874-18T1